## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

vs.              No. CR 10-1760 JB

MICHAEL HARMON,

   Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress and Memorandum in Support Thereof, filed January 14, 2011 (Doc. 40)("Motion"). The Court held a hearing on March 28, 2011. The primary issues are: (i) whether Defendant Michael Harmon has standing to contest the search of the vehicle he was driving; (ii) whether the traffic stop that New Mexico Department of Public Safety Motor Transportation Division Officer Hermilo Lucero initiated was a legal stop; (iii) whether the Court should suppress evidence of the contraband Lucero discovered in the vehicle's spare tire, because Harmon -- who is an African-American -- alleges that race was the motivating, if not only, factor in Lucero's decision to stop him; (iv) whether Harmon voluntarily consented to the search of the vehicle; and (v) whether Lucero's search exceeded the scope of Harmon's consent. The Court will deny Harmon's motion. The Court finds that Harmon has standing to contest the search of the vehicle, because the registered owner gave him permission to drive the vehicle. The Court finds that the traffic stop was legal, because Lucero had reasonable suspicion that Harmon violated one of New Mexico's traffic regulations. The Court finds that Lucero did not stop Harmon because of his race. Even if one of Lucero's motives in stopping Harmon was Harmon's race, Lucero's subjective motives for conducting the stop are irrelevant to

whether the stop was reasonable under the Fourth Amendment of the United States Constitution, and the Court is not convinced that suppression is an appropriate remedy for an Equal Protection Clause violation. Given the totality of the circumstances, the Court finds that Harmon voluntarily consented to the search of the vehicle. The Court finds that Lucero's search did not exceed the scope of Harmon's consent, because Lucero had probable cause to search the spare tire.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d). The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982), cert. denied, 461 U.S. 916 (1983). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Merritt, 695 F.2d at 1269.

1.      On Friday, May 14, 2010, Lucero was patrolling Interstate 40 ("I-40") east of Grants, New Mexico. See Transcript of Hearing at 4:10-17, 7:17-24 (taken March 28, 2011)(Braun, Lucero)("Tr.").[1]

---

[1] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

2.      At approximately 8:59 a.m., at mile marker 90 on I-40, Lucero stopped a vehicle with Arizona license plate number 265JPZ.  See Unit Log at 1, Defendant's Exhibit B; Tr. at 7:25-3 (Braun, Lucero).

3.      A plate credit detail, which was run on November 21, 2010, revealed that the plate for the vehicle with the Arizona license plate 265JPZ expired on January 31, 2004.  See Plate Credit Detail at 1, Defendant's Exhibit A; Tr. at 49:13-24 (Braun, Lucero).

4.      The only way to know that a vehicle with license plate 265JPZ was being driven on I-40 on May 14, 2010 is from of Lucero's unit log, where he recorded his activities, and if Lucero incorrectly input the license plate into the unit log, the plate credit detail would not be accurate to the car that Lucero stopped.  See Tr. at 49:25-50:8 (Braun, Moya).

5.      Section 66-3-1 of the New Mexico Statutes Annotated states: "With the exception of vehicles identified in Subsection B of this section, every motor vehicle, trailer, semitrailer and pole trailer when driven or moved upon a highway is subject to the registration and certificate of title provisions of the Motor Vehicle Code."  NMSA 1978, § 66-3-1A.

6.      The penalty for driving an unregistered vehicle is a misdemeanor with a potential penalty of a "fine of not more than three hundred dollars ($300) or by imprisonment for not more than ninety days or both."  NMSA 1978, § 66-8-7B.

7.      At 9:02 a.m., Lucero released the driver of the vehicle with the license plate 265JPZ with a verbal warning.  See Unit Log at 2; Tr. at 42:11-24 (Knoblauch, Lucero).

8.      Lucero did not see or have an opportunity to see Harmon before he allowed the driver of the first vehicle with the license plate 265JPZ to leave.  See Tr. at 99:3-12 (Court, Lucero).

9.      Harmon is African-American.  See id. at 99:3-5 (Court, Lucero).

10.      Lucero testified that he did not terminate his stop of the vehicle with the license plate

-3-

265JPZ based on seeing the vehicle Harmon was driving.  See Tr. at 8:15-17 (Braun, Lucero).

11.     After Lucero concluded the stop of the vehicle with license plate 265JPZ, he continued on patrol operations.  See Tr. at 8:18-19 (Braun, Lucero).

12.     While on patrol, Lucero approached a silver-colored Dodge Intrepid.  See id. at 8:21-22 (Lucero)

13.     Lucero testified that he noticed that the vehicle was weaving in its lane.  See Tr. at 8:22-23 (Lucero).

14.     Lucero was not sure whether the driver was intoxicated or fatigued.  See id. at 8:23-24 (Lucero).

15.     Lucero testified that, in the past, he has conducted traffic stops on individuals who were driving while intoxicated at 9:00 a.m. and that it would not be unusual to stop a person who was driving while intoxicated at 9:00 a.m.  See id. at 10:23-11:3 (Braun, Lucero).

16.     Lucero continued to follow the driver, and immediately before the driver and Lucero entered into a construction zone, the vehicle, which was traveling in the right lane, swerved, causing its front and rear passenger tires to cross over the outer white line.  See Tr. at 8:24-9:1 (Lucero); id. at 9:4-10 (Braun, Lucero).

17.     Lucero described the road conditions as straight and levelly paved.  See id. at 9:13-14 (Braun, Lucero)(" Q.  Can you describe the road conditions for us that morning?  A.  It was straight and levelly paved.").

18.     Lucero testified that there was not any wind that would cause a vehicle to swerve.  See id. at 9:15-17 (Braun, Lucero).

19.     When Lucero saw the vehicle swerve and cross the line, he thought that the driver was likely intoxicated or fatigued.  See Tr. at 10:20-22 (Braun, Lucero).

20.     Section 66-7-317 of the New Mexico Statutes Annotated states:

Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:

>   A. a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety;
>
>   B. upon a roadway which is divided into three lanes a vehicle shall not be driven in the center lane except when overtaking a [and] passing another vehicle where the roadway is clearly visible and such center lane is clear of traffic within a safe distance, or in preparation for a left turn or where such center lane is at the time allocated exclusively to traffic moving in the direction the vehicle is proceeding and is signposted to give notice of such allocation; and
>
>   C. official signs may be erected directing slow-moving traffic to use a designated lane or designating those lanes to be used by traffic moving in a particular direction regardless of the center of the roadway and drivers of vehicles shall obey the directions of every such sign.

NMSA 1978, § 66-7-317 (alteration in original).

21.     The only act that Harmon did which was not safe was that Harmon crossed over the fog line -- the white line -- and Lucero was not sure whether Harmon was intoxicated or fatigued. See Tr. at 62:7-10 (Knoblauch, Lucero).

22.     Lucero saw Harmon weaving within his lane and crossing the fog line and was not sure if Harmon was intoxicated and/or fatigued, which would make it unsafe for the innocent motoring public traveling on our highways if he was tired or intoxicated.  See Tr. at 62:18-22 (Lucero).

23.     Crossing the line was not unsafe.  See Tr. at 63:16 (Lucero).

24.     Lucero followed Harmon for thirteen miles through the construction zone.  See id. at 43:9-13 (Knoblauch, Lucero).

25.     Lucero did not know that Harmon was driving the vehicle or that an African-

American was driving this vehicle.  See id. at 99:3-8 (Court, Lucero).

26.     When the vehicle and Lucero's vehicle exited the construction zone, Lucero turned on his lights and initiated a traffic stop.  See id. at 9:1-3 (Lucero); id. at 13:13-18 (Braun, Lucero).

27.     Lucero initiated the stop at approximately 9:12 a.m. at mile marker 103 of I-40.  See Unit Log at 2.

28.     Lucero had a video recorder in his vehicle; when he turned on his lights, the video recorder started recording and captured the minute before the stop.  See Tr. at 11:4-16 (Braun, Lucero).

29.     There is not any noticeable weaving of the vehicle during the time on the video tape. See Tr. at 45:24-46:5 (Knoblauch, Moya); id. at 46:19-47:1 (Moya)(stating that he did not see noticeable weaving).

30.     The road conditions were bumpy; the vehicle was going up and down over the bumps.  See Tr. at 45:21-46:8 (Mora, Knoblauch)(stating that you can see bumps and dips in the roadway that the vehicles where the vehicles go down, and that he saw the vehicle bump up on one of the bumps in the road).

31.     Also at 9:12 a.m., Lucero made a request through the Computer Aided Dispatch system in his police car for information on the Intrepid's license plate.  See Unit Log at 2.

32.     When Lucero ran the request, he discovered the car belonged to Arturo Curt Johnson. See Tr. at 64:1-4 (Knoblauch, Lucero).

33.     As Lucero approached the Intrepid on the passenger's side, he observed that the rear windows were partially rolled down and could smell a strong odor of air freshener emitting from the car.  See Tr. at 14:2-6 (Lucero).

34.     Lucero believed that, generally, people use strong masking odors, such as air

fresheners, to mask the odor of illegal narcotics or to try to evade a drug-sniffing dog.  See id. at 15:23-16:2 (Braun, Lucero).

35.     The first time Lucero noticed that Harmon was African-American was when he approached the vehicle.  See id. at 99:3-5 (Court, Lucero).

36.     Lucero made contact with the driver and sole occupant, Harmon, and asked for Harmon's driver's license, registration, and insurance.  See Tr. at 15:3-5 (Braun, Lucero).

37.     As Harmon handed Lucero the documentation, Lucero noticed that his hand was shaking more than a person's hand usually shakes during a traffic stop.  See Tr. at 15:7-12 (Lucero).

38.     After Lucero obtained the documents, he asked Harmon to step back to his police car. See Tr. at 15:21-23 (Braun, Lucero).

39.     Harmon complied with Lucero's request.  See Tr. at 16:2 (Lucero).

40.     Lucero told Harmon he had stopped him for weaving in the lane and crossing the line in the construction zone.  See Tr. at 16:9-12 (Braun, Lucero).

41.     This statement was not accurate; instead, Harmon crossed over the line before the construction zone.  See Tr. at 16:9-12 (Braun, Lucero); id. at 56:12-18 (Knoblauch, Lucero).

42.     Lucero was a credible witness as the suppression hearing, and the Court credits his testimony at that hearing.  See Tr. at 16:9-12 (Braun, Lucero); id. at 56:12-18 (Knoblauch, Lucero).

43.     Lucero was not unsure where the vehicle swerved, and Lucero was not lying at the hearing.  See Tr. at 16:9-12 (Braun, Lucero); id. at 56:15-57:6 (Knoblauch, Lucero).

44.     Lucero stated that he made the inaccurate statement because he was nervous making the traffic stop.  See Tr. at 56:15-57:6 (Knoblauch, Lucero).

45.     While he was filling out a traffic citation, Lucero asked Harmon from where he was coming.  See Tr. at 16:18-22 (Braun, Lucero).

46.     Lucero said he was coming from home -- Prescott, Arizona.  See id. at 20-22 (Lucero).

47.     Lucero asked Harmon where he was going, and Harmon responded that he was going to Flint, Michigan to his daughter's graduation from college.  See id. at 17:2-4 (Lucero).

48.     Harmon was not sure of the name of the college.  See Tr. at 69:15-70:4 (Knoblauch, Lucero).

49.     In response to Lucero's question regarding how long Harmon would be in Flint, Harmon told Lucero that he would be in Flint until Monday.  See Tr. at 17:8-9 (Lucero).

50.     Lucero thought Harmon's answer was odd, because Lucero thought that Harmon probably would not get to Flint until Monday. See Tr. at 17:12-16 (Lucero).

51.     It is approximately 1657 miles from where Harmon was stopped to Flint -- which would take approximately 25 hours to drive.   See Rand McNally, http://maps.randmcnally.com/#s=screen&lat=38.976965&lon=-95.76747&zoom=1&loc1=Grant s%2C%20NM%2C%20USA&loc2=Flint%2C%20MI%2C%20USA&loc3=&loc4=&loc5=&loc 6=&loc7=&loc8=&loc9=&loc10= (last visited April 20, 2011).

52.     Lucero asked Harmon to whom the car belonged.  See Tr. at 17:17-18 (Braun, Lucero).

53.     Harmon said the car belonged to a friend named Art, then corrected himself and said his friend's name was Curt.  See Tr. at 17:18-20 (Lucero); id. at 63:24-25 (Lucero).

54.     Arturo Curt Johnson gave Harmon permission to drive the car, and there were no conditions on him driving the car.  See Tr. at 109:14-110:2 (Knoblauch, Harmon).

55.     After Johnson gave Harmon permission to drive the car to Flint, Harmon made arrangements with one of Johnson's relatives for Harmon to pick up the car in Phoenix, Arizona.

-8-

See Tr. at 112:4-114:20 (Braun, Harmon).

56.     Lucero asked Harmon to stand in front of the vehicle while he checked the federal sticker on the vehicle and the public VIN number.  See Tr. at 17:22-25 (Lucero).

57.     Lucero then returned to his police car and issued Harmon a traffic citation.  See Tr. at 18:8-9 (Lucero).

58.     Lucero explained to Harmon that he could contest the citation in court, or admit guilt and receive a written warning.  See Tr. at 18:9-22 (Lucero).

59.     Harmon advised that he would admit guilt and take the written warning.  See Tr. at 18:12-13 (Braun, Lucero).

60.     After Lucero issued a written warning to Harmon, Lucero returned all Harmon's paperwork -- his driver's license, registration, proof of insurance, and a copy of the citation -- and made sure that Harmon had everything and told him to be careful.  See Tr. at 18:17-23 (Braun, Lucero).

61.     Lucero did not retain any of Harmon's documents.  See Tr. at 18:24-25 (Braun, Lucero).

62.     Harmon turned away and started walking back to the Intrepid.  See id. at 19:2-3 (Lucero).

63.     When Harmon reached the rear of the Intrepid, Lucero called out to Harmon.  See id. at 19:5-8, 33-24 (Lucero).

64.     Harmon walked back to Lucero's police car.  See id. at 19:22-23 (Lucero).

65.     Lucero asked Harmon whether he could ask a few more questions and began by asking whether there was anything illegal in the vehicle.  See Tr. at 19:22-24 (Lucero).

66.     Harmon responded that there was not anything illegal in the vehicle.  See id. at 19:24

-9-

(Lucero).

67.     In a series of questions, Lucero asked Harmon if he had any weapons of mass destruction, any large sums of currency, or any illegal drugs.  See Tr. at 20:1-4 (Lucero).

68.     To each of Lucero's questions, Harmon answered: "[N]o".  Tr. at 20:3-4 (Lucero).

69.     Lucero asked Harmon if he could search the Intrepid.  See id. at 20:6 (Lucero)

70.     Harmon responded to Lucero's request by saying: "I thought you did."  Tr. at 20:6-7 (Lucero).

71.     Lucero told Harmon that he had only checked the VIN number.  See Tr. at 20:7-8 (Lucero).

72.     Harmon then responded: "Sure."  Tr. at 20:8 (Lucero).

73.     Lucero pulled out a consent-to-search form, asked Harmon to read the form, and stated that, if the form was okay with him, to sign it.  See Tr. at 20:8-9 (Lucero).

74.     Lucero did not have his weapon drawn at any point.  See id. at 20:10-14 (Braun, Lucero).

75.     Lucero did not use aggressive language and his tone was conversational.  See Tr. at 20:10-25 (Braun, Lucero).

76.     The consent form states:

> I _____ hereby grant my consent to _____ officers of the New Mexico Department of Public Safety, to search the following vehicle described below including luggage, containers, and contents therein.  If search reveals a false or altered compartment, access to such compartment will be made by any means available; including drilling and/or cutting of compartments.
>
> . . . .
>
> I understand I have the right to refuse consent to the search described above and to refuse to sign this form.  I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get

me to consent to the search described above or to sign this form.

DATE:_____        TIME: _____

1.      _____        2.      _____

Department of Public Safety Consent to Search Form, Government's Exhibit 2.

77.      Harmon put his name on the top of the form where it states "I _____ hereby grant

my consent to ____ officers of the New Mexico Department of Public Safety, to search the

following vehicle."  Consent to Search Form at 1.  See Tr. at 21:19-25 (Braun, Lucero).

78.      Harmon then read the form out loud.  See Tr. at 22:1 (Lucero)

79.      As Harmon was reading the form out loud, he expressed concern about the sentence

regarding drilling and/or cutting of compartments.  See Tr. at 22:6-7 (Lucero)("He did have some

concerns about drilling and cutting any compartments.").

80.      Lucero assured Harmon that he would not cut or drill into the vehicle unless he

discovered a false or non-factory compartment.  See id. at 22:7-9 (Lucero).

81.      As Lucero continued to read the form, he asked: "Well can I refuse?  You said I could

refuse."  Tr. at 22:15-17 (Braun, Lucero).

82.      Lucero responded to Harmon's question by saying: "Absolutely, you can refuse all

you want."  Tr. at 22:15-19 (Braun, Lucero); id. 23:3-4 (Lucero).

83.      Harmon said he was in a hurry.  See id. at 23:4-5 (Lucero).

84.      Lucero advised Harmon that he would get him out on the road as quickly as possible.

See Tr. at 23:4-7 (Lucero).

85.      Harmon then signed the bottom of the consent-to-search form on the line marked

number 1.  See Tr. at 23:6-7 (Lucero).

86.      For officer safety, Lucero patted Harmon down for weapons and asked him to walk

down the shoulder of the interstate while he searched the Intrepid.  <u>See</u> <u>id.</u> at 23:10-24:4 (Braun, Lucero).

87.     Lucero told Harmon to keep walking and again stated, sir, keep walking.  <u>See</u> Tr. at 75:17-21 (Knoblauch, Lucero).

88.     Rodi is Lucero's drug detection dog.  <u>See</u> Tr. at 5:14-7:8 (Braun, Lucero).

89.     Lucero attended seven weeks of training to become a K-9 handler; Rodi is trained and certified in the detection of certain drugs.  <u>See</u> Tr. at 5:12-7:8 (Braun, Lucero).

90.     Rodi is trained in the odors of marijuana, cocaine, heroin, and methamphetamine. <u>See</u> <u>id.</u> at 25:6-11 (Braun, Lucero).

91.     Lucero conducted a preliminary search of the vehicle and removed any items in the car that would be hazardous for Rodi.  <u>See</u> Tr. at 24:13-23 (Braun, Lucero).

92.     Lucero then deployed Rodi on an exterior and interior sniff of the vehicle.  <u>See</u> <u>id.</u> at 24:23-25:3 (Braun, Lucero).

93.     Rodi alerted to the trunk area and the backseat area.  <u>See</u> <u>id.</u> at 25:3-4 (Lucero).

94.     Based on his experience, Lucero concluded that Rodi alerting indicated that there was the odor of marijuana, cocaine, heroin, or methamphetamine in the area of the vehicle's truck and backseat.  <u>See</u> Tr. at 25:12-15 (Braun, Lucero).

95.     After Rodi alerted, Lucero started a search of the vehicle.  <u>See</u> <u>id.</u> at 25:16-17 (Braun, Lucero).

96.     Lucero went through the trunk and the backseat area.  <u>See</u> <u>id.</u> at 25:18-20 (Lucero).

97.     Once he cleared the areas and did not find any drugs or a constructed false compartment, he checked the spare tire.  <u>See</u> <u>id.</u> at 25:22-23 (Lucero).

98.     When Lucero lifted the spare tire, he noticed that it was heavier than spare tires

-12-

usually are.  See id. at 26:12-13 (Lucero).

99.     A Goodyear sixteen-inch tire -- like the one in the vehicle Harmon was driving -- weighs approximately twenty-five to thirty pounds, and the weight of the narcotics -- 4.3 pounds -- would be a fairly small fraction of the weight of the tire.  See id. at 104:18-105:17 (Knoblauch, O'Neill).

100.    When Lucero bounced the spare tire, it sounded to him as though there was something inside of it.  See id. at 26:13-14 (Lucero).

101.    Lucero used an echo test to check the volume of the tire.  See id. At 26:17-18 (Lucero).

102.    During the echo-test, Lucero heard a thump, which indicated to him that there was something concealed in the tire.  See id. at 26:17-24 (Braun, Lucero).

103.    When a person hits a normal tire with nothing inside of it, one should be able to hear the rim on the inside and a pinging sound; when there is something concealed in the tire, one will hear a thump instead of a ping.  See id. at 26:17-22 (Lucero).

104.    Lucero knew something was in the spare tire based on his training and experience, and he felt that he needed to put Harmon in a safe place where he could not harm Lucero or himself, so he put handcuffs on Harmon and put him in the backseat of Lucero's police car.  See Tr. at 27:1-10 (Lucero).

105.    Lucero told Harmon that he was going to cut into the tire, because he believed that there was something in the tire.  See id. at 27:10-12 (Lucero).

106.    When Lucero told Harmon that he was going to cut into the tire, Harmon did not indicate that he was withdrawing his consent or limiting his consent.  See Tr. at 27:16-19 (Braun, Lucero).

-13-

107.    Harmon asked Lucero whether he would replace the tire if there was nothing in it. See Tr. at 27:12-13 (Lucero).

108.    Lucero told Harmon that he would replace the tire if there was nothing in it. See Tr. at 27:13-14 (Lucero).

109.    Lucero cut the tire open, and discovered several packages of a white powdery substance that tested positive for cocaine and a green leafy substance that tested positive for marijuana. See id. at 27:22-28:7 (Braun, Lucero).

110.    Lucero then advised Harmon that he was under arrest. See Tr. at 28:8-12 (Braun, Lucero).

## PROCEDURAL BACKGROUND

On June 10, 2010, a grand jury returned an indictment charging Harmon with possession with intent to distribute 500 grams and more of cocaine in violation of 21 U.S.C. § 541(a)(1) and (b)(1)(B), and possession with intent to distribute less than 50 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D).

On January 14, 2011, Harmon filed his Motion to Suppress and Memorandum in Support Thereof. See Doc. 40.  Harmon moves the Court, pursuant to the Fourth and Fourteenth Amendment of the United States Constitution and Mapp v. Ohio, 367 U.S. 643 (1961), and its progeny, to enter an order suppressing the evidence in the form of alleged contraband discovered in the spare tire of the vehicle Harmon was driving on May 14, 2010.  Harmon argues that he has standing to contest the search, because he was the driver of the vehicle at the time of the stop. Harmon argues that Lucero did not have reasonable suspicion that a traffic violation occurred or was occurring.  Harmon asserts that he is an African-American and that his race was a significant factor, if not the only reason, in Lucero's decision to stop him.  Harmon argues that the scope of the consent

-14-

that he gave did not include consent to Lucero cutting into the spare tire.  Harmon also argues that his consent to the search of the vehicle was not voluntary.

On February 7, 2011, the United States filed its Response to Defendant's Motion to Suppress.  See Doc. 46.  The United States argues Harmon's status as a driver of the vehicle does not grant him standing to challenge the legality of the search.  The United States argues that, to have standing to challenge the search of the vehicle, Harmon has the burden of establishing that he was in lawful possession of it and that he has failed to meet this burden.  The United States argues that the traffic stop was lawful, because Lucero had reasonable suspicion to believe that Harmon violated NMSA 1978, § 66-7-317, because he personally observed the vehicle weave in its lane and then cross the outer white line.  The United States argues that Lucero's subjective motives for conducting the traffic stop are irrelevant.  The United States also argues that, under the totality of the circumstances, it is clear that Harmon voluntarily consented to a search of the vehicle and that Lucero did not coerce Harmon into granting consent.  The United States also argues that Lucero did not exceed the scope of Harmon's consent when he cut into the spare tire, because Lucero had developed probable cause to search the tire.

On February 16, 2011, Harmon filed the Defendant's Reply to Government's Response to Defendant's Motion to Suppress.  See Doc. 51.  In his reply, Harmon argues that he has standing to contest the search, because the person to whom the vehicle was registered gave him permission to possess it.  Harmon also argues that the traffic stop was not a legitimate stop.

### RELEVANT LAW REGARDING FOURTH-AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or

affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The protections of the Fourth Amendment are enforceable against state actors through the Due-Process Clause of the Fourteenth Amendment to the United States Constitution. See Mapp v. Ohio, 367 U.S. at 655; United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008)("[T]he Fourth Amendment applies against state law enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment.").

Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness. The Supreme Court of the United States has stated that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (footnotes omitted).

### 1. **Fourth-Amendment Standing**.

"A district court cannot suppress evidence unless the movant proves that a search implicates Fourth Amendment interests." United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995). "[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search." United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)). "Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'" United States v. Poe, 556 F.3d at 1121 (quoting United States v. Rhiger, 315 F.3d 1283, 1285 (10th Cir. 2003)). See Smith v. Maryland, 442 U.S. 735, 740 (1979). "A Defendant has standing to challenge a search only if he or she ha[d] a reasonable expectation of privacy in the area being searched." United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996). To decide whether a reasonable expectation of privacy existed, the

court considers concepts of real or personal property law, keeping in mind that "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." Rakas v. Illinois, 439 U.S. 128, 143 & n.12 (1978).  While neither ownership nor lawful possession are determinative, they are often dispositive factors; a defendant seeking to establish standing bears the burden of demonstrating "that he gained possession from the owner or someone with the authority to grant possession." United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

"For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers." United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 129 S. Ct. 781, 784 (2009)).  "Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop." United States v. White, 584 F.3d at 945.  "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment." United States v. Holt, 264 F.3d 1215, 1220 (10th Cir. 2001)(en banc).  "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the driver's." United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004)(citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)).  Passengers may challenge their detention during traffic stops. See United States v. Wilson, 96 F. App'x at 643 ("Wilson does not assert any such interest in the truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000), and citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v. Shareef, 100 F.3d at 1500)).  The Tenth Circuit "reject[s] any notion that a vehicular stop detains for Fourth Amendment purposes only the driver simply because the passenger may be free to depart." United States v. Erwin, 875

F.2d at 270.

"To establish standing to challenge a car search, the defendant bears the burden of showing that he had a legitimate possessory interest in or [a] lawful control over the car." United States v. Valdez Hocker, 333 F.3d 1206, 1209 (10th Cir. 2003)(internal quotation marks and citation omitted). "Because the focus of the inquiry is on reasonable expectations, however, a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself." United States v. Valdez Hocker, 333 F.3d at 1209 (citation omitted). The Tenth Circuit has held the following criteria "important[ ] though not determinative" in determining whether a defendant has standing to assert a violation of his Fourth Amendment rights based on the search on objects inside a vehicle: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." United States v. Parada, 577 F.3d 1275, 1280 (10th Cir. 2009)(quoting United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000))(internal quotation marks omitted)

### 2.   **Traffic Stops**.

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment." United States v. Holt, 264 F.3d at 1220.  Courts

> assess the reasonableness of a routine traffic stop under the principles laid out for investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220 (quoting Terry v. Ohio, 392 U.S. at 20)).  The Terry v. Ohio framework applies whether the traffic

stop is based on probable cause or reasonable suspicion.  See United States v. Holt, 264 F.3d at 1230.  A court must examine "both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope of the [further] detention must be carefully tailored to its underlying justification.'" United States v. Wilson, 96 F. App'x at 644 (quoting United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997)).

"A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009).  "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation . . . ."  United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005)(citation and internal quotation marks omitted).

### 3.    Consensual Searches.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the

government "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'" United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366.  The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the threatening presence of several officers; (ii) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and tone of voice; (iii) the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure to advise the defendant that [he or] she is free to leave; . . . (vi) the display of a weapon[;] and (vii) physical touching by the officer.

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(quotations, alterations, and citations omitted).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010); United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006); United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law-enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that

individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).    Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." United States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

## RELEVANT LAW ON THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's constitutional rights, the government will be prohibited from using that evidence in a criminal prosecution of that person.  See United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.")(citations omitted).  In addition, a defendant may also suppress any other evidence deemed to be the "fruit of the poisonous tree," because it is evidence which was discovered as a direct result of the unlawful law enforcement activity.  United States v. Olivares-Rangel, 458 F.3d 1104, 1108-09 (10th Cir. 2006).  To suppress evidence that was derived following unlawful activity, the defendant must show that there is a factual nexus between the illegality and the challenged evidence.  See United States v. Olivares-Rangel, 458 F.3d at 1109; United States v. Nava-Ramirez, 210 F.3d at 1131.

For the exclusionary rule to apply, the defendant must show, by a preponderance of the evidence, a constitutional violation, and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the prosecution to establish that some exception to the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999.

## ANALYSIS

Harmon has standing to contest the search of the vehicle, because the registered owner gave him permission to drive the vehicle.  The traffic stop was legal, because Lucero had reasonable suspicion that Harmon violated one of New Mexico's traffic regulations.  Lucero did not stop Harmon because of his race.  Even if one of Lucero's motives in stopping Harmon was Harmon's race, Lucero's subjective motives for conducting the stop are irrelevant to whether the stop was reasonable under the Fourth Amendment, and the Court is not convinced that suppression would be an appropriate remedy for an Equal Protection Clause violation.  Given the totality of the circumstances, Harmon voluntarily consented to the search of the vehicle.  Lucero's search did not exceed the scope of Harmon's consent, because Lucero had probable cause to search the spare tire.

## I.  HARMON HAS STANDING TO CONTEST THE SEARCH OF THE VEHICLE.

Harmon argues that he has standing to contest the search of the vehicle, because he was the driver of the vehicle at the time of the stop.  At the hearing, Harmon testified that he had Johnson's permission to be in possession of the vehicle.

The United States argues that Harmon's status as the driver of the vehicle does not grant him standing to challenge the legality of the search, and thus Harmon has failed to meet his burden of establishing that he gained possession from the owner or someone with the authority to grant

possession.

Harmon has standing to contest the search of the vehicle.  "To establish standing to challenge a car search, the defendant bears the burden of showing that he had a legitimate possessory interest in or [a] lawful control over the car."  United States v. Valdez Hocker, 333 F.3d at 1209 (internal quotation marks and citation omitted).  The Tenth Circuit has held the following criteria "important[ ] though not determinative" in deciding whether a defendant has standing to assert a violation of his Fourth Amendment rights based on the search on objects inside a vehicle: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle."  United States v. Parada, 577 F.3d at 1280 (quoting United States v. Allen, 235 F.3d at 489 (internal quotation marks omitted).  Although Harmon has not asserted ownership of the items seized from the vehicle, and although he did not explicitly testify as to his privacy expectation, Harmon "did take the stand to explain how he came to possess the vehicle."  United States v. Valdez Hocker, 333 F.3d at 1209.  Harmon got permission to drive the vehicle from Johnson, who owned the vehicle.  See Tr. at 109:14-22 (Knoblauch, Harmon); id. at 64:1-4 (Knoblauch, Lucero)(stating that, when Lucero ran a request through the CAD system for information on the vehicle, he discovered the car belonged to Johnson).  Harmon gained possession of the vehicle in Phoenix from Johnson's relative, with whom Harmon had made arrangements to pick up the vehicle.  See Tr. at 111:17-114:16 (Braun, Harmon).  Because Harmon borrowed the car from the car's registered owner, Harmon had a legitimate possessory interest in the vehicle.  See United States v. Soto, 988 F.2d 1548, 1552-53 (10th Cir. 1993)(finding that evidence that the defendant borrowed the vehicle from its rightful owner and absent evidence that the wrongfully

-23-

possessed the vehicle was sufficient to "confer standing on [the defendant] to challenge the subsequent search of the car").  The Court thus finds that Harmon has standing to contest the search of the vehicle.  See United States v. Rubio-Rivera, 917 F.2d at 1275 ("Where the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle."  (citation omitted)).

## II.     THE TRAFFIC STOP THAT LUCERO INITIATED WAS A LEGAL STOP.

Harmon argues that the stop which led to the charges being filed against Harmon was not a legal stop.  Harmon argues that Lucero informed him that he had observed Harmon weaving within his lane.  Harmon argues that this is not a violation of NMSA 1978, § 66-7-317.  Harmon further argues that, although Lucero asserted that Harmon crossed over the white line, assuming that such action would violate New Mexico statutes, the Court should take into account that Lucero is unsure as to where the alleged infraction occurred -- whether it occurred in the construction zone or before the construction zone -- and thus it is possible that the infraction did not occur and "nothing that [Lucero] says is credible."  Motion at 9.  Harmon argues, however, that it is not necessary for the Court to determine whether it is true that he crossed over the white line, because, in United States v. Gregory, 79 F.3d 973 (10th Cir. 1996), the Tenth Circuit found that a single occurrence of moving to the right shoulder of a roadway did not amount to a violation of a Utah statute similar to NMSA 1978, § 66-7-317.

The United States argues that the traffic stop was lawful.  It argues that Lucero observed the vehicle weave within its lane and then cross the outer white line, and that, based on this observation, Lucero had reasonable suspicion to believe that Harmon violated NMSA 1978, § 66-7-317.  The United States argues that the traffic stop was thus lawful.  The United States also argues that United

-24-

States v. Gregory is factually distinct and that the Tenth Circuit has subsequently limited the opinion's scope.

"The validity of a traffic stop under the Fourth Amendment turns on whether th[e] particular officer had reasonable suspicion that th[e] particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." United States v. Valenzuela, 494 F.3d 886, 888 (10th Cir. 2007)(quoting United States v. Tibbetts, 396 F.3d 1132, 1137 (10th Cir. 2005)). See United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995)(stating that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring," and that a court's "sole inquiry is whether th[e] particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction" (quoting Delaware v. Prouse, 440 U.S. 648, 661 (1979)).

Courts consider the totality of the circumstances in determining whether an officer had reasonable suspicion that the motorist violated one of the jurisdiction's traffic regulations. See United States v. Finney, 316 F. App'x 752, 756-57 (10th Cir. 2009)(agreeing with the district court that, considering all surrounding facts and circumstances, "including that crossing the centerline on a two-way street is almost never safe," the officers had reasonable suspicion that the driver violated a Kansas law providing that a vehicle shall be driven as nearly as practicable entirely within a single lane when there were no external factors to account for the vehicle's swerve over the center line, and when, shortly before the alleged violation, the vehicle was weaving in its own lane and was driving at a high rate of speed). In United States v. Herrell, 41 F. App'x 224 (10th Cir. 2002), the Tenth Circuit found that it was "reasonable, considering the totality of the circumstances," for the deputy

sheriff "to conclude that a violation of N.M. Stat. § 66-7-317 and/or a statute prohibiting the operation of a motor vehicle while impaired had occurred or was occurring."  41 F. App'x at 230 (footnote omitted).  Several officers waited for the vehicle to arrive in Artesia, New Mexico, because they had received information that the driver might be under the influence of methamphetamine and that there might be methamphetamine in the vehicle.  See 41 F. App'x at 226.

> As the van drove through Riverside, Deputy Menefee observed the van twice cross over the double yellow line dividing the highway and then return to its lane of travel. The highway was straight and there was no other traffic in view at the time.  The weather was clear and there was no apparent road condition that would have caused the driver of the van to swerve.  Deputy Menefee concluded that the driver of the van might be impaired or sleepy, which led to the van drifting or moving over the center lane and into the west-bound lane and that, therefore, he had cause to stop and investigate.

41 F. App'x at 226.  During the stop, the deputy obtained consent to search, which led him to find methamphetamine.  See 41 F. App'x at 227.  "At some point during the stop, [the deputy] cited [the driver] for failing to produce a driver's license on demand and for a violation of N.M. Stat. Ann. § 66-7-317."  41 F. App'x at 227.  The district court denied the defendant's motion to suppress, and the defendant appealed, arguing that, "because there were not grounds to believe that the van's crossing of the center line could not be made with safety, Deputy Menefee did not have a reasonable suspicion that a violation of N.M. Stat. Ann. § 66-7-317(A) (1988) had occurred."  41 F. App'x at 227.  The Tenth Circuit found "no error in the district court's determination that the initial stop of the van in which Defendant was a passenger was reasonable."  41 F. App'x at 228.

> Finding that Deputy Menefee was also "concerned about the condition of the driver as evidenced by the driver's violation" of N.M. Stat. Ann. § 66-7-317, the district court concluded that considering the totality of the circumstances, Deputy Menefee had a reasonable articulable suspicion that a traffic violation had occurred or was occurring.  We agree.
>
> . . . .

Defendant argues that Deputy Menefee could not have had a reasonable suspicion that the van had violated N.M. Stat. Ann. § 66-7-317 because a violation of that statute requires both that the vehicle cross the center dividing line and that the driver did not first ascertain that such movement could be made with safety. In effect, he argues that because the van was traveling within the speed limit and there was no traffic that night in the vicinity and specifically no traffic when the van crossed the double yellow line, Deputy Menefee could not have had a reasonable suspicion that the driver of the van didn't ascertain before the van crossed the center line that that movement could be made safely.

. . . .

The logical extension of Defendant's argument is that a law enforcement officer would have probable cause to believe or a reasonable articulable suspicion that a driver had violated a statute like N.M. Stat. § 66-7-317 only when he observed the driver cross over a lane line and collide or nearly collide with another vehicle. Only in such circumstances would there be an objectively observable manifestation of a driver's failure to ascertain, before moving out of his lane, that the move could be made safely.

. . . .

At issue is not whether the van violated N.M. Stat. Ann. § 66-7-317 but whether Deputy Menefee had a reasonable, articulable suspicion that a traffic violation had occurred or was occurring. Not only did Officer Menefee observe the van move onto or cross the center line twice within a short distance, but there was no apparent reason for the movement, suggesting that the movement was not intentional, following the driver's ascertainment that the movement could be made with safety, but was unintentional, suggesting that the driver might be impaired by alcohol or drugs or was sleepy. The time was sometime around 1:30 a.m., suggesting that the latter was a reasonable possibility. Indeed, as the district court found, "the officer articulated on the witness stand that he was concerned about whether the driver was impaired by alcohol or drugs or was sleepy, in which case he posed a danger not only to other traffic that might be on the highway but also to the occupants of the vehicle." Memorandum Opinion dated October 29, 1999 at p. 9. There being no other apparent explanation of why the van twice crossed into or over the center lane and into the lane for oncoming traffic and given the time of day, it was reasonable, considering the totality of the circumstances, for Deputy Menefee to conclude that a violation of N.M. Stat. § 66-7-317 and/or a statute prohibiting the operation of a motor vehicle while impaired had occurred or was occurring.

41 F. App'x at 229-30 (footnote omitted).

The traffic stop that Lucero initiated was a legal stop. Section 66-7-317 of the New Mexico

Statutes Annotated states:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:
>
> > A. a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety . . . .

NMSA 1978, § 66-7-317.  At the hearing, when Lucero was asked what Harmon did that was not safe, Lucero testified that Harmon crossed over the fog line -- the white line -- and that Lucero was not sure whether Harmon was intoxicated or fatigued.  See Tr. at 62:7-10 (Knoblauch, Lucero).  Lucero stated: "Again, at that time with him weaving within his lane, him cr[o]ssing the fog line, I wasn't sure if the gentleman -- the driver was intoxicated, fatigued, which would make it unsafe for the innocent motoring public traveling on our highways if he was tired or intoxicated."  Tr. at 62:18-22 (Lucero).  When asked again whether he could tell the Court what Harmon did that was unsafe by crossing the line, Lucero stated: "I guess I couldn't, [sir] like I said."  Tr. at 63:16 (Lucero).

Although Lucero testified that he could not tell the Court what Harmon did that was unsafe, NMSA 1978, § 66-7-317 states only "a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  NMSA 1978, § 66-7-317.  Although the Court can find no New Mexico case which discusses the language in NMSA 1978, § 66-7-317, the United States District Court of New Mexico and the Tenth Circuit have construed the statute.  In United States v. Bassols, No. 10–cr–02077, 2011 WL 1343158 (D.N.M. Mar. 29, 2011), the Honorable James A. Parker, Senior United States District Judge, determined that a driver violates NMSA 1978, § 66-7-317 when "the driver's tires leave the lane by making contact with the line or stripe dividing the line

-28-

from the shoulder or another lane," but did not address the statutory language that the driver first ascertain that such movement can be made with safety.  2011 WL 1343158, at *8.  In United States v. Herrell, the Tenth Circuit rejected the defendant's argument that the officer did not have reasonable suspicion that a violation of NMSA 1978, § 66-7-317 had occurred or was occurring, because the officer could not have had a reasonable suspicion that the driver of the vehicle did not ascertain before the vehicle crossed the line that the movement could be made safely.  See 41 F. App'x at 229.  The Tenth Circuit found that there was no apparent reason for the vehicle's movement across the center line, which suggested "that the movement was not intentional, following the driver's ascertainment that the movement could be made with safety, but was unintentional, suggesting that the driver might be impaired by alcohol or drugs or was sleepy."  41 F. App'x at 229. The Tenth Circuit did not state that an officer must have reasonable suspicion that the driver's movement must have been unsafe, and instead, appeared to reject that argument.  See 41 F. App'x 229 n.2 ("The logical extension of Defendant's argument is that a[n] . . . officer would have . . . a reasonable articulable suspicion that a driver had violated a statute like N.M. Stat. § 66-7-317 only when he observed the driver cross over a lane line and collide or nearly collide with another vehicle.").

In United States v. Finney, the Tenth Circuit, in a footnote, stated:

> Addressing [Kan. Stat. Ann. § 8-1522 -- which contains the same language as NMSA 1978, § 66-7-317], the Kansas Court of Appeals recently noted, "in articulating reasonable suspicion that a [violation] has occurred in order to justify the traffic stop, the totality of the circumstances must make it appear to the officer that not only did the defendant's vehicle move from its lane of travel, *but it left its lane when it was not safe to do so*."  State v. Ross, 37 Kan.App.2d 126, 149 P.3d 876, 879 (2007) (emphasis added).

316 F. App'x at 756 n.2.  Although Kansas courts have required that the totality of the circumstances make it appear that the vehicle left its lane when it was not safe to do so, the language of NMSA

1978, § 66-7-317 states only that "the driver [must] first ascertain[ ] that . . . movement [from the lane] can be made with safety;" it does not require the driver do something unsafe in crossing the line.  Furthermore, no New Mexico court has stated that there is such a requirement, and the only case that the Court can find which has addressed the requirement that a driver ascertain that he or she can move from the lane with safety, United States v. Herrell, did not require that the officer have reasonable suspicion that the vehicle's movement was unsafe, and indeed, appeared to reject this argument.

The Court thus finds that, although Lucero testified that he could not tell the Court what was unsafe about Harmon's actions, this admission does not mean that Lucero could not have had reasonable suspicion that a violation of NMSA 1978, § 66-7-317 had occurred or was occurring. The Court finds that Lucero had reasonable suspicion that a violation of NMSA 1978, § 66-7-317 had occurred or was occurring. because Lucero observed the vehicle cross the white line for no apparent reason, which suggests that the movement was not intentional, following an ascertainment that the movement could be made with safety, but that the movement was unintentional, suggesting that Harmon might be fatigued or impaired.  Lucero testified that the vehicle was weaving in its lane.  See Tr. at 8:22-23 (Lucero).  Lucero was not sure whether the driver was intoxicated or fatigued.  See id. at 8:23-24 (Lucero).  Lucero testified that, in the past, he has conducted traffic stops on individuals who were driving while intoxicated at 9:00 a.m. and that it would not be unusual to stop a person who was driving while intoxicated at 9:00 a.m.  See Tr. at 10:23-11:3 (Braun, Lucero).  Lucero continued to follow the driver, and immediately before the driver and Lucero entered into a construction zone, the vehicle, which was traveling in the right lane, swerved, and its front and rear passenger tires crossed over the outer white line.  See Tr. at 8:24-9:1 (Lucero);

id. at 9:4-10 (Braun, Lucero).[2]  When he saw the vehicle swerve and cross the line he thought that

the driver was likely intoxicated or fatigued.  See Tr. at 10:20-22 (Braun, Lucero).  As in United

States v. Herrell, where the officer had "a reasonable, articulable suspicion that a traffic violation had

occurred or was occurring," when the officer observed the vehicle cross the center line twice, when

"there was no apparent reason for the movement, suggesting that the movement was not intentional,

following the driver's ascertainment that the movement could be made with safety, but was

unintentional, suggesting that the driver might be impaired by alcohol or drugs or was sleepy," and

when the time was around 1:30 a.m., suggesting that impairment was a reasonable possibility,

Lucero observed the vehicle's tires cross the white line,[3] Lucero testified that there were no other

apparent reasons -- such as weather or road conditions -- for the movement across the line, which

suggests that the movement was not intentional, following an ascertainment that the movement

could be made with safety, and Lucero testified that he thought the driver was likely intoxicated or

fatigued and that it was not unusual for drivers to be intoxicated at 9:00 a.m.  It was thus

---

[2] Harmon argues that Lucero is unsure where the violation occurred, and that, at worst, nothing he says is credible.  At the hearing, however, the Court had a chance to weigh Lucero's credibility.  Lucero testified that the vehicle swerved over the white line before the vehicle entered the construction zone, that his statement to Harmon that the vehicle swerved in the construction zone was inaccurate, and that he made the inaccurate statement because he was nervous.  The Court finds that Lucero is not unsure of where the vehicle swerved and does not believe that Lucero was lying in Court.

[3] The Court does not believe that the difference between the driver crossing the center line in United States v. Herrell and Harmon crossing the white line in this case is significant.  Section 66-7-317 of the New Mexico Statutes Annotated states only that when a "roadway has been divided into two or more clearly marked lanes for traffic . . . a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."  NMSA 1978, § 66-7-317.  The statute does not distinguish between the center line and the outer line.  A movement over either line, without a prior ascertainment that the movement can be made with safety, violates the statute.  There is nothing in the statute or in United States v. Herrell which suggests that a violation of the statute depends on which line a driver crosses.

"reasonable, considering the totality of the circumstances, for [Lucero] to conclude that a violation of N.M. Stat. § 66-7-317 . . . had occurred or was occurring." United States v. Herrell, 41 F. App'x at 230.  See United States v. Valenzuela, 494 F.3d at 888-89 (concluding that the detective had reasonable suspicion to believe the defendant violated Colorado's traffic code, justifying the initial stop of the vehicle when the defendant moved his vehicle several feet into another lane of traffic).

Harmon argues that the Tenth Circuit, in United States v. Gregory has held that a one time occurrence of crossing over the line does not amount to a violation of a statute stating that a vehicle should be operated as nearly as practicable within a single lane.  In United States v. Gregory, the Tenth Circuit interpreted a Utah statute very similar to NMSA 1978, § 66-7-317 and held, under the circumstances of that case, a driver's brief drift outside his lane of traffic into an emergency lane did not amount to a violation of Utah law sufficient to effectuate a traffic stop.  The Tenth Circuit stated:

> We do not find that an isolated incident of a vehicle crossing into the emergency lane of a roadway is a violation of Utah law.  This interpretation of Utah law has been followed by the Utah courts.  See e.g., State of Utah v. Bello, 871 P.2d 584, 586 (Utah App.1994) (a single instance of weaving does not constitute a violation of Utah Code Ann. § 41-6-61(1)).  We agree with the Utah court which noted that the statute requires only that the vehicle remain entirely in a single lane "as nearly as practical." Id.  The road was winding, the terrain mountainous and the weather condition was windy.  Under these conditions any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity.  The driver may have decided to pull over to check his vehicle and then have a sudden change of mind and pulled back into the traffic lane.

79 F.3d at 978.  The Tenth Circuit has since "clarified that Gregory does not 'stand[] for the proposition that a single instance of drifting onto the shoulder can never be a violation of a traffic statute like [NMSA 1978, § 66-7-317]." United States v. Valenzuela, 494 F.3d at 888 (citing United States v. Cline, 349 F.3d 1276, 1287 (10th Cir. 2003).  "Rather, we must analyze objectively all the surrounding facts and circumstances to determine whether the officer had reasonable

suspicion that a violation of the applicable statute had occurred." United States v. Valenzuela, 494 F.3d at 888 (citing United States v. Ozbirn, 189 F.3d 1194, 1198 (10th Cir. 1999)).  On several occasions, the Tenth Circuit has distinguished United States v. Gregory, based on the facts and circumstances before it.  See United States v. Herrell, 41 F. App'x at 231 (citing United States v. Ozbirn, 189 F.3d at 1198-99 (finding that officer had probable cause to stop motor home which drifted onto the shoulder twice within a quarter hour under optimal road, weather and traffic conditions); United States v. Meyer, 20 F. App'x 808 (10th Cir. 2001)(finding that trooper had probable cause to stop vehicle for an observed violation of Kan. Stat. Ann. § 8-1522 after vehicle drifted across the lane twice onto the shoulder in optimal road and weather conditions); United States v. Asido, 9 F. App'x 925 (10th Cir. 2001)(finding that trooper had sufficient basis to stop vehicle for violating Kan. Stat. Ann. § 8-1522, after vehicle drifted over to the right shoulder then left to where it nearly touched the center line before straightening out and there were no weather or road conditions that could account for the movement); United States v. De La Fuente-Ramos, 242 F.3d 391, at *5-6 (10th Cir. 2000)(finding that trooper had reasonable articulable suspicion that the driver was impaired and to stop the vehicle for violating Okla. Stat. tit. 47, § 11-309, requiring that a vehicle be driven "as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety," when the van was observed to weave from the lane line to the shoulder several times, touching the lane line three times), cert. denied, 532 U.S. 936 (2001); United States v. Dunn, 133 F.3d 933, at *1-2 (10th Cir.)(finding that trooper had probable cause to stop sedan which swerved once over solid line marking edge of lane on straight highway with slight grade for a violation of Kan. Stat. Ann. § 8-1522), cert. denied, 523 U.S. 1132 (1998)).  Several facts distinguish United States v. Gregory from the case before the Court.  Unlike United States v. Gregory, where the defendant was traveling

in a vehicle where the road was winding, the terrain was mountainous, and the weather condition

was windy, in this case, the road conditions were straight and levelly paved, and there was not any

wind that would cause a vehicle to swerve.  See Tr. at 9:13-14 (Braun, Lucero)("Q.  Can you

describe the road conditions for us that morning?  A.  It was straight and levelly paved."); id. at

9:15-17 (Braun, Lucero).  Unlike United States v. Gregory, where the Tenth Circuit stated that,

under the road and weather conditions in the case for it, "any vehicle could be subject to an isolated

incident of moving into the right shoulder of the roadway, without giving rise to suspicion of

criminal activity," United States v. Gregory, 79 F.3d at 975, "[i]n this case, nothing in the record

suggests any outside factors contributed to [Harmon's] [weaving and swerve outside of the line]."

United States v. Valenzuela, 494 F.3d at 888 (citation omitted).  Although Maurice Moya, a private

investigator, testified that the road -- in the construction area --was bumpy, causing the vehicle to

dip up and down, see 45:21-46:8 (Mora, Knoblauch)(stating that you can see bumps and dips in the

roadway that the vehicles where the vehicles go down, and that he saw the vehicle bump up on one

of the bumps in the road), the vehicle swerved before the construction zone.  The Court therefore

finds that United States v. Gregory is distinguishable.  Because Lucero had reasonable suspicion that

a violation of N.M. Stat. § 66-7-317 had occurred or was occurring, the Court finds that the stop that

Lucero initiated was a legal stop.

III.    **HARMON'S RACE PLAYED NO ROLE IN LUCERO'S DECISION TO STOP HARMON, AND, EVEN IF HARMON'S RACE DID PLAY A ROLE, LUCERO'S SUBJECTIVE MOTIVES FOR CONDUCTING THE TRAFFIC STOP ARE IRRELEVANT TO WHETHER THE STOP WAS REASONABLE UNDER THE FOURTH AMENDMENT, AND THE COURT IS NOT CONVINCED THAT SUPPRESSION IS AN APPROPRIATE REMEDY FOR AN EQUAL PROTECTION VIOLATION.**

Harmon argues that his race was a significant factor if not the only reason in Lucero's

decision to stop him.  Harmon argues that "[s]uch behavior is . . . forbidden by the Equal Protection

-34-

Clause of the United States Constitution."  Motion at 10.

The United States argues that Lucero's subjective motives for conducting the traffic stop are irrelevant.  The United States argues that Harmon's race played no role in Lucero's decision to stop him, and that, even if race had played a role, suppression would not be the appropriate remedy, because it is aware of no case in which a court has applied the exclusionary rule to a violation of the Equal Protection Clause.

Harmon's race did not play a role in Lucero's decision to stop Harmon.  Lucero did not see, or have an opportunity to see Harmon before he allowed the driver of the first vehicle to drive away. See Tr. at 99:3-12 (Court, Lucero).  Lucero testified that he did not terminate the stop early based on seeing Harmon's vehicle.  See id. at 8:15-17 (Braun, Lucero).  After Lucero concluded the stop, he continued back on patrol operations.  See id. at 8:18-19 (Braun, Lucero).  While on patrol, Lucero approached the Intrepid.  See id. at 8:21-22 (Lucero).  Lucero testified that the vehicle was weaving in its lane.  See id. at 8:22-23 (Lucero).  Lucero was not sure whether the driver was intoxicated or fatigued.  See id. at 8:23-24 (Lucero).  Lucero continued to follow the driver, and right before the driver and Lucero entered into a construction zone, the vehicle, which was traveling in the right lane, swerved and its front and rear passenger tires crossed over the outer white line.  See id. at 8:24-9:1 (Lucero); id. at 9:4-10 (Braun, Lucero).  Lucero followed the driver for thirteen miles through the construction zone.  See id. at 43:9-13 (Knoblauch, Lucero).  Lucero did not know that Harmon was driving the vehicle or that an African-American was driving this vehicle.  See id. at 99:3-8 (Court, Lucero).  The first time Lucero noticed Harmon was African-American was after he initiated the stop, when he approached the car.  See id. at 99:3-5 (Court, Lucero).  The Court thus finds that, despite Harmon's assertions in his motion that his race motivated the stop, the evidence shows that Harmon's race was not a factor in Lucero's decision to stop him.

Furthermore, even if Lucero was "motivated to seek a basis for stopping the van because of [Harmon's race]," that fact "does not render the stop unreasonable under the Fourth Amendment; that fact is irrelevant." United States v. Herrell, 41 F. App'x at 229 (citing United States v. Botero-Ospina, 71 F.3d at 787). In United States v. Botero-Ospina, the Tenth Circuit stated:

> [A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, "whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop." It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle.

71 F.3d at 787 (internal citation and footnote omitted). In Whren v. United States, 517 U.S. 806, 813 (1996), the Supreme Court stated:

> We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

517 U.S. at 813. See United States v. Adkins, 1 F. App'x 850, 851 (10th Cir. 2001)(stating that the selective enforcement of the law through practices like racial profiling violates the Constitution, but that, as Whren v. United States makes clear, the "fact that Defendant may have an equal protection claim against the arresting officer has absolutely no bearing on whether the officer's traffic stop was reasonable under the Fourth Amendment" and finding that the magistrate judge correctly barred testimony regarding the arresting officer's alleged history of pretextual stops based on race, because the officer's subjective motivations were irrelevant). The Court thus finds that, even if Harmon's race motivated in part Lucero's decision to stop Harmon, which it did not, Lucero's subjective motivations are irrelevant to whether the traffic stop was reasonable under the Fourth Amendment.

Even if Harmon's race motivated Lucero's decision to stop Harmon, the Court is not aware of a court that has applied the exclusionary rule for a violation of the Equal Protection Clause.  As the Sixth Circuit stated in United States v. Nichols, 512 F.3d 789, 794 (6th Cir. 2008), overruled on other grounds by United States v. Buford, 632 F.3d 264 (6th Cir. 2011):

> Since we know from Whren that the evidence against Nichols would not be suppressed under the Fourth Amendment (even if the officers were improperly motivated by race), we are reluctant to graft that Amendment's traditional remedy into the equal protection context.  Indeed, we are aware of no court that has ever applied the exclusionary rule for a violation of the Fourteenth Amendment's Equal Protection Clause and we decline Nichols's invitation to do so here.  Rather, we believe the proper remedy for any alleged violation is a 42 U.S.C. § 1983 action against the offending officers.

512 F.3d at 794.  See United States v. Torrellas, 197 F. App'x 318, 319 (5th Cir. 2006)("Torrellas's claim that the alleged racial profiling violated the Equal Protection Clause . . . fails. Although whether suppression is an appropriate remedy for an Equal Protection Clause violation is an open question . . . we need not answer that question . . . , because Torrellas has [not] provide[d] evidence of any discriminatory motives by the officers."); United States v. Chavez, 281 F.3d 479, 486 (5th Cir. 2002)("Neither the Supreme Court nor our Court has ruled that there is a suppression remedy for violations of the Fourteenth Amendment's Equal Protection Clause, . . . ."); United States v. Cousin, No. 1:09-CR-89, 2010 WL 338087, at *5 (E.D. Tenn. Jan. 19, 2010)("[N]o court has suppressed evidence for a violation of the Fourteenth Amendment's Equal Protection Clause. . . . The Sixth Circuit [has] clearly determined civil actions under 42 U.S.C. § 1983 are the appropriate remedy for violations of the Equal Protection Clause and the exclusionary rule does not apply."); United States v. Foster, No. 2:07-cr-254-WKW, 2008 WL 1927392, at *5 n.10 (Apr. 28, 2008)("While a handful of "other jurists and commentators have proposed such a rule, there does not appear to be any case in which a court has ever actually applied suppression as a remedy, at least

in the absence of a concomitant Fourth Amendment violation." (internal quotation marks and citations omitted)). Even if there was evidence that Lucero purposefully discriminated against Harmon in stopping him, the Court does not believe that suppression would be an appropriate remedy; instead, the appropriate remedy for an alleged violation is a 42 U.S.C. § 1983 action.[4]

## IV.   HARMON VOLUNTARILY CONSENTED TO THE SEARCH OF THE VEHICLE.

Harmon argues that, after he signed the consent-to-search form, he indicated he wanted to withdraw the consent by asking if he could refuse the search. Harmon argues that Lucero told him only that he would have him back on the road soon, and that Lucero then deprived him of his documents and personal possessions, and that Lucero placed them in the police vehicle. Harmon argues that Lucero then ordered him to leave the immediate area. Harmon argues that the United States has the burden of proving valid consent to the search and that it cannot prove that Harmon gave consent.

The United States argues that Harmon's consent was voluntary. It argues that, under the totality of the circumstances in this case, it is clear that Harmon voluntarily consented to a search of the vehicle and that Lucero did not coerce Harmon into granting consent. The United States

---

[4] There are powerful arguments against the exclusionary rule. Both scholars and judges have posited that exclusion of probative, reliable evidence of a defendant's guilt is too high a price to pay for the unknown degree of deterrence that exclusion achieves. See, e.g., Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L.Rev. 363, 369-70, 442-43 (1999); Akhil Reed Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 795-800 ("[I]f deterrence is the key, the idea is to make the government pay, in some way, for its past misdeeds, in order to discourage future ones. But why should that payment flow to the guilty? Under the exclusionary rule, the more guilty you are, the more you benefit."); Hon. Malcolm Richard Wilkey, A Call for Alternatives to the Exclusionary Rule, 62 Judicature 351 (1978-1979); Hon. Malcolm Richard Wilkey, The Exclusionary Rule: Why Suppress Valid Evidence?, 62 Judicature 214 (1978-1979). Given the powerful arguments against the exclusionary rule, because of its negative effect on the truth-seeking process, the Court does not believe it should extend the exclusionary rule further, particularly where there is a monetary remedy available for equal-protection violations.

asserts that, when Lucero asked for Harmon's consent, he did so in a conversational tone, did not

have his weapon drawn or have his hand on his weapon; that Harmon was not handcuffed; and that,

while Harmon initially said he thought Lucero had already searched the vehicle, when Lucero

explained he only checked the VIN, Harmon verbally consented to an actual search "without

hesitation."  Response at 11.  The United States contends that, moreover, Harmon then read the

consent-to-search form which further explained the search, that Harmon asked questions about the

form in a manner which indicated his understanding of it, and that, even after being advised of his

right to refuse consent, both through the form and Lucero, Harmon signed the consent form.

Harmon states that "[t]his Circuit follows the bright-line rule that an encounter initiated by

a traffic stop may not be deemed consensual unless the driver's documents have been returned to

him." United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994), overruled on other

grounds by United States v. Botero-Ospina, 71 F.3d 783.  After Lucero issued a written warning to

Harmon, however, Lucero returned all Harmon's paperwork -- his driver's license, registration,

proof of insurance, and a copy of the citation -- and made sure that Harmon had everything, gave

him a warning and told him to be careful.  See Tr. at 18:17-23 (Braun, Lucero).  Lucero did not

retain any of Harmon's documents, in his official vehicle or otherwise.  See Tr. at 18:24-25 (Braun,

Lucero).  As Harmon turned around and started to walk back to his vehicle, Lucero, intending to

initiate a consensual encounter, called out to Harmon, and, when Harmon walked back to Lucero

without any direction from Lucero, Lucero asked him whether there was anything illegal in the

vehicle, to which Harmon responded no.  See Tr. at 19:1-24 (Braun, Lucero).  In United States v.

Barraza-Martinez, 364 F. App'x 453, 458 (10th Cir. 2010), the Tenth Circuit stated:

> Generally, "[a] traffic stop may become a consensual encounter, requiring no
> reasonable suspicion, if the officer returns the license and registration and asks
> questions without further constraining the driver by an overbearing show of

authority." United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000). If the documents have been returned, the analysis turns on whether the individual "has an objective reason to believe that he was not free to end his conversation with the law enforcement officer and proceed on his way." United States v. Sandoval, 29 F.3d 537, 540 (10th Cir. 1994).

Both defendants rely heavily on Sandoval, in which the Tenth Circuit held the officer's response of "No, wait a minute," to the motorist's question "That's it?" rendered the subsequent questioning non-consensual. Id. at 542. The present case, however, is distinguishable from Sandoval on two grounds. Unlike Sandoval, Deputy Bentley indicated the original investigative detention was terminated by handing Barraza-Martinez a copy of the warning citation and stating he was free to go. Barraza-Martinez then began opening the patrol car door, demonstrating he understood he was free to leave. Deputy Bentley's subsequent question, "Hey, William, can I ask you a few more questions?" did not retract Barraza-Martinez's freedom to leave the patrol car. Unlike the "No, wait a minute" directive at issue in Sandoval, Deputy Bentley's question, along with his earlier statement that Barraza-Martinez was free to go, served to give a reasonable person in Barraza-Martinez's position the choice to submit to the additional questions. Barraza-Martinez's consent to the search of the vehicle was a product of the subsequent consensual exchange. Accordingly, the district court properly denied the defendants' motions to suppress.

364 F. App'x at 458. Lucero returned Harmon's documents to him; the Court's analysis thus turns

on whether Harmon had an objective reason to believe that he was not free to end his conversation

with Lucero and proceed on his way. As in United States v. Barraza-Martinez, where the officer's

question whether he could ask a few more questions did not retract the defendant's freedom to leave

the patrol car when the officer had indicated the original investigative detention was terminated by

handing the defendant a copy of the citation and stating he was free to go, and the defendant had

begun opening the patrol car door, demonstrating he understood he was free to leave, Lucero

returned all of Harmon's documents, gave him a copy of the citation, told Harmon to be careful, and

Harmon started walking back to his vehicle. Lucero's call out to Harmon when Harmon was near

the vehicle he was driving thus did not retract Harmon's freedom to leave. A reasonable person in

Harmon's situation would not have an objective reason to believe he was not free to end his

conversation with Lucero.  See United States v. Barraza-Martinez, 364 F. App'x at 458.  He could

have said he did not want to answer questions and needed to continue on his trip.  The ensuing

encounter was thus a consensual encounter.

Under the totality of the circumstances, Harmon voluntarily consented to a search of the

Intrepid during the consensual encounter.  First, the Court notes that Harmon signed a consent-to-

search form.  The form is simple and states the following:

> I _____ hereby grant my consent to _____ officers of
> the New Mexico Department of Public Safety, to search the following vehicle
> described below including luggage, containers, and contents therein.  If search
> reveals a false or altered compartment, access to such compartment will be made by
> any means available; including drilling and/or cutting of compartments.
>
> . . . .
>
> I understand I have the right to refuse consent to the search described above
> and to refuse to sign this form.  I further state that no promises, threats, force,
> physical or mental coercion of any kind whatsoever have been used against me to get
> me to consent to the search described above or to sign this form.
>
> DATE:_____        TIME: _____
>
> 1.    _____        2.    _____

Consent to Search Form at 1.  This form contains Harmon's signature, dated May 14, 2010.  The

consent-to-search form does not completely resolve the question whether the search was voluntary,

but it is a factor weighing strongly in favor of finding that the search was voluntary.  See United

States v. Romero, 247 F. App'x 955, 961-62 (10th Cir. 2007)("Consent is a factual issue to be

determined by the totality of the circumstances, not by per se rules.  In other words, no one factor --

including the execution of a consent-to-search form -- is dispositive.").  This form informed Harmon

of his right to refuse consent.  Furthermore, as Harmon read the form out loud, before he signed the

bottom of the form, he asked questions about the sentence which mentions drilling or cutting

compartments, and his right to refuse consent. This exchange indicates that Harmon understood the meaning of the form and his right to refuse consent before he signed the bottom of the form, giving his consent to the search. The other circumstances also weigh in favor of finding that Harmon's consent was voluntary. When Lucero asked for Harmon's consent, he did not have his weapon drawn and was speaking in a conversational tone. See United States v. Rojas-Silos, 260 F. App'x 49, 51 (10th Cir. 2008)("The record clearly establishes trooper Salas obtained free and voluntary consent . . . to search the vehicle. Trooper Salas did not brandish his weapon, physically touch either individual, or use an aggressive tone. In short, Rojas-Silos fails to point to any evidence tending to show his consent was not validly given."). When Lucero asked for Harmon's consent to search the vehicle, he was not in possession of Harmon's identification or other papers, and Harmon was not in a private, isolated place -- he was in the full view of the public on the side of the interstate. See United States v. Romero, 743 F. Supp. 3d 1281, 1337 (D.N.M. 2010)(Browning, J.)(finding that the defendant's consent to search was voluntary, and relying, in part, on the fact that neither agent was in possession of the defendant's personal effects, such as his papers, and when the defendant was not in a private, isolated place when the officers asked for permission to search; rather, the defendant was in full view of the public through the windows of the officer's vehicle).

Harmon argues that Lucero's actions of having him walk down the shoulder of the interstate after he consented to the search placed him in a position where he could not withdraw his consent, and, thus, Lucero coerced his consent. In the context of a pat-down search of a defendant following the defendant's consent to a search of his vehicle, the Tenth Circuit has stated that "[p]olice officers may take reasonable steps necessary to protect their personal safety." United States v. Manjarrez, 348 F.3d 881, 886 (10th Cir. 2003)(citing United States v. Melendez-Garcia, 28 F.3d 1046, 1051 (10th Cir. 1994)). The Tenth Circuit addressed the defendant's argument that he was unable to

withdraw his previous consent to search the car because of the "intimidating" and "coercive" nature

of the "pat-down."  348 F.3d at 887.

> An atmosphere of intimidation and coercion exists if there is evidence of "physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery."  United States v. Pena, 143 F.3d 1363, 1367 (10th Cir. 1998); see also United States v. Davis, 202 F.3d 1060, 1062 (8th Cir. 2000).  In Davis, a suspect claimed he was unable to end a consensual encounter with the police during his brief pat-down by the officer.  Id.  The Eighth Circuit held that the officer did "nothing to change the consensual nature of the encounter except frisk [the suspect] for weapons.  When that momentary seizure ended, [the suspect] remained free to answer [the officer's] questions or to leave."  Id.
>
> The record in this case is devoid of any evidence Trooper Roland intimidated or coerced Defendant.  Simply, Trooper Roland briefly patted Defendant down for the Trooper's own safety.  Trooper Roland did not raise his voice at Defendant, threaten Defendant, nor did he physically intimidate Defendant.  Trooper Roland's pat-down was neither coercive or intrusive, but rather de minimus.  Moreover, like the situation in Davis, Trooper Roland only momentarily patted Defendant down.  Once the brief seizure ended, Defendant was again engaged in a consensual encounter and was free to withdraw his prior consent.  Defendant never objected to Trooper Roland's search and never attempted to withdraw his prior consent.  See United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir.1995) (explaining that once a consent to search is given, it may be limited or withdrawn at a later time.  Any withdrawal or limitation, however, must be expressly and explicitly made).  We find no merit in Defendant's argument that Trooper Roland's pat-down vitiated Defendant's prior consent to search the car.

348 F.3d at 887-88.  Once Harmon gave consent, Lucero had good reason to conduct the search in

safe manner.  See United States v. Manjarrez, 348 F.3d at 886.  Although Lucero asked Harmon to

walk a little ways from the vehicle so that he could conduct the search in a safe manner, as in United

States v. Manjarrez, where the defendant was free to withdraw his consent after the pat-down,

Harmon was free to call out to Lucero, and withdraw his consent to the search.  Harmon did not

object to the search or attempt to withdraw his prior consent.  The Court thus finds that an

atmosphere or intimidation of coercion did not exist.

Under the totality of the circumstances, the Court finds that Harmon voluntarily consented

to the search of the vehicle.  See United States v. Herrell, 41 F. App'x at 232-33 (finding that, given

the totality of the circumstances, the defendant's consent to search the van and its contents was

voluntary when the defendant signed a written consent form consenting to the search, which

informed the defendant that he did not have to sign the form, when, although the defendant may not

have read the form before signing it, he was within hearing distance when another officer read the

form to another person, when there was no testimony that the officer threatened the defendant, used

a hostile tone of voice, touched the defendant, or displayed his weapon, and while the defendant was

detained, this factor was not determinative); United States v. Santurio, 29 F.3d 550, 553 (10th Cir.

1994)(finding that the district court properly found that the defendant's consent was voluntary when

the defendant read the form before he signed it and when the district judge found that the officer did

not threaten the defendant).

## V.   LUCERO DID NOT EXCEED THE SCOPE OF HARMON'S CONSENT IN SEARCHING THE SPARE TIRE, BECAUSE LUCERO HAD PROBABLE CAUSE TO SEARCH THE TIRE.

Harmon argues that the consent-to-search form limited the scope of the search to those areas

specifically noted in the form -- luggage, containers, and their contents.  Harmon argues that the

language in the form allowed Lucero to expand his search if he found a false or altered

compartment.  Harmon argues that "[n]othing was found anywhere within the common definition

of the word compartment" and that there is no reasonable definition of "tire" which includes

"compartment."  Motion at 11.  Harmon argues that it would be unreasonable to assume that his

consent to more of a search than that "spelt out in the consent to search form could have been

included."  Motion at 11.  Harmon also argues that Lucero did not have probable cause to search the

tire.

The United States argues that Lucero did not exceed the scope of Harmon's consent.  It

argues that Lucero developed probable cause to search the tire when his canine alerted to the area around the vehicle's trunk and rear passenger seat.  It argues that the probable cause "alone" gave Lucero the authority to cut into the spare tire.

"Under the automobile exception to the Fourth Amendment's warrant requirement, 'police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant.'" United States v. Vazquez, 555 F.3d 923, 930 (10th Cir. 2009)(quoting Florida v. Meyers, 466 U.S. 380, 381 (1984). "Moreover, '[o]nce the officer[s'] suspicions rise to the level of probable cause, they are empowered to search the entire vehicle, including the trunk and all containers therein that might contain contraband.'" United States v. Vazquez, 555 F.3d at 930 (quoting United States v. Chavez, 534 F.3d 1338, 1345 (10th Cir. 2008)).  "Probable cause to search an automobile exists 'where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'"  United States v. Montes-Ramos, 347 F. App'x 383, 395-96 (10th Cir. 2009)(quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)).  Courts must "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Ledesma, 447 F.3d at 1316 (citations omitted).  "The ultimate question is whether the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."  United States v. Ledesma, 447 F.3d at 1316 (internal quotation marks and citations omitted).

Even if a defendant's consent did not authorize an officer to "cut open his spare tire, the search [is] nonetheless permissible [if] the officers obtained probable cause to search the tire during

the portion of the search to which the defendant did consent." United States v. Carbajal-Iriarte, 586

F.3d 795, 802 (10th Cir. 2009).  In United States v. Carbajal-Iriarte, the Tenth Circuit found that the

district court did not err in refusing to suppress drugs recovered from the seat of a vehicle after

officers cut open the upholstery.  See 596 F.3d at 802.  The defendant argued that the officers

exceeded the scope of his consent when they cut open the upholstery of the seat.  See 596 F.3d at

802.  The Tenth Circuit stated:

> Here, the officers had an independent legal basis upon which to proceed because the
> dog's positive alert to the presence of drugs in the van provided probable cause.  See
> United States v. Ludwig, 10 F.3d 1523, 1527-28 (10th Cir. 1993).  As a result, it is
> immaterial whether Carbajal-Iriarte consented to cutting open the seat.  Once the
> officers had probable cause to search the seat, his consent was no longer necessary.

586 F.3d at 802.  See United States v. Morales-Zamora, 914 F.2d 200, 205-06 (10th Cir.

1990)(finding that it need not "reach the issue of consent because probable cause to search was

supplied when the dog alerted to the vehicles" and stating that, under the "vehicle exception to the

general rule that searches are reasonable only if conducted pursuant to a valid search warrant," no

warrant was necessary for the search of the vehicles to be reasonable under the Fourth Amendment).

Lucero had probable cause to search the spare tire.  Rodi alerted to the trunk area and the

backseat area.  See Tr. at 25:3-4 (Lucero).  Lucero testified that, based on his experience, Rodi

alerting indicated that there was the odor of either marijuana, cocaine, heroin, or methamphetamine

in the area of the vehicle's truck and backseat.  See Tr. at 25:12-15 (Braun, Lucero).  The Tenth

Circuit has "consistently held that probable cause can be based on alerts by trained dogs."  United

States v. Clarkson, 551 F.3d 1196, 1203 (10th Cir. 2009)(citation omitted).  Lucero attended seven

weeks of training to become a K-9 handler, where he and Rodi were graded as a team, and he and

his dog are certified.  See Tr. at 5:12-7:8 (Braun, Lucero).  Because Rodi is trained and certified to

alert to the odors of marijuana, cocaine, heroin, and methamphetamine, see Tr. at 25:6-11 (Braun,

Lucero), Rodi's alert supports probable cause, see United States v. Clarkson, 551 F.3d at 1203

("This court has further indicated the narcotics dog must be 'reliable' or 'trained' in order for an

alert to support probable cause." (citation omitted)).   Lucero thus had probable cause to believe that

there were narcotics in the vehicle.  See United States v. Carbajal-Iriarte, 586 F.3d at 802-03 ("Here,

the officers had an independent legal basis upon which to proceed because the dog's positive alert

to the presence of drugs in the van provided probable cause.").   Harmon argues that Lucero did not

have probable cause to search the spare tire, because Rodi did not alert to the tire -- Rodi alerted

only to the trunk and backseat area.   In United States v. Rosborough, 366 F.3d 1145 (10th Cir.

2004), the Tenth Circuit held that a "canine alert toward the passenger area of a vehicle gives rise

to probable cause to search the trunk as well; the search of [the defendant's] vehicle subsequent to

the canine alert was therefore supported by probable cause."  366 F.3d at 1153.  The Tenth Circuit

noted that its "holdings with regard to drug dog alerts do not lend themselves to that level of

exactness.  A dog alert creates general probable cause to search a vehicle; it does not implicate the

precision of a surgeon working with scalpel in hand."  366 F.3d at 1153.   Rodi alerted to the

backseat and trunk area.  After Rodi alerted, Lucero started the search of the vehicle.  See Tr. at

25:16-17 (Braun, Lucero).  Lucero went through the trunk and the backseat area.  See id. at 25:18-20

(Lucero).  Once he cleared the areas and did not find any drugs or a constructed false compartment,

he checked the spare tire.  See id. at 25:22-23 (Lucero).  Given the Tenth Circuit's holding that a

canine alert toward the passenger area of a vehicle gives rise to probable cause to search the trunk

as well, the Court finds that Rodi's alert to the trunk and back seat gave probable cause to search

the tire, especially when Lucero's search of the backseat and trunk area did not reveal any narcotics

or other compartments which might contain narcotics.[5]  The spare tire was a container that might

contain contraband, and "'[o]nce the officer[s'] suspicions rise to the level of probable cause, they

are empowered to search the entire vehicle, including the trunk and all containers therein that might

contain contraband.'"  United States v. Vazquez, 555 F.3d at 930 (quoting United States v. Chavez,

534 F.3d at 1345).  See United States v. Strickland, 902 F.2d 902, 942-43 (11th Cir. 1990)(finding

that there was probable cause to search a spare tire when the spare tire was from a different

manufacturer, the tire's rim was bent, the tire was heavier than normal, and something inside the tire

flopped when the tire was moved).  The Court thus finds that Lucero had probable cause to search

the spare tire.

Furthermore, when Lucero lifted the spare tire, he noticed that it was heavier than spare tires

usually are, and when he bounced the spare tire, it sounded to Lucero as though there was something

inside of the tire.  See Tr. at 26:12-13 (Lucero); id. at 26:13-14 (Lucero).  Lucero echo-tested the

spare tire and heard a thump, which indicates that there is something concealed in the tire.  See id.

at 26:17-24 (Braun, Lucero).  "The ultimate question is whether the facts and circumstances within

the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient

in themselves to warrant a man of reasonable caution in the belief that an offense has been or is

being committed."  United States v. Ledesma, 447 F.3d at 1316 (internal quotation marks and

citations omitted).  These circumstances, along with the Rodi's alert, were sufficient to warrant an

officer of reasonable caution in the belief that the spare tire contained drugs.  The Court thus finds

_____

[5] The Court does not believe that Lucero's actions of lifting the spare tire out of the trunk
was an illegal search, because, as the Court has discussed, Lucero had probable cause to search the
tire.  Lucero had probable cause before he lifted the tire, because of the canine alert.  See United
States v. Carbajal-Iriarte, 586 F.3d at 802 ("Here, the officers had an independent legal basis upon
which to proceed because the dog's positive alert to the presence of drugs in the van provided
probable cause." (citation omitted)).

that Lucero had probable cause to search the tire.  The Court therefore finds that Lucero did not

exceed the scope of Harmon's consent.

**IT IS ORDERED** that the Defendant's Motion to Suppress and Memorandum in Support

Thereof**,** filed January 14, 2011 (Doc. 40) is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
  United States Attorney
James R.W. Braun
  Assistant United States Attorney
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Charles E. Knoblauch
  Assistant Federal Public Defender
Albuquerque, New Mexico

        *Attorney for the Defendant*