# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                             No. CR 10-1760 JB

MICHAEL HARMON,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

        **THIS MATTER** comes before the Court on: (i) the Defendant's Motion to Reconsider or Rehear, filed July 15, 2011 (Doc. 72)("Motion to Reconsider"); (ii) the Defendant's Motion by Way of the Defendant for Withdrawal of Plea Agreement filed on May 20, 2011, filed September 21, 2011 (Doc. 87)("Motion to Withdraw Plea"); and (iii) the Defendant's Supplemental Motion to Withdraw Plea and to Re-Open Suppression Proceeding, filed December 22, 2011 (Doc. 102)("Supplemental Motion"). The Court held a hearing on March 9, 2012. The primary issues are: (i) whether the Court should reconsider its Memorandum Opinion and Order, filed June 6, 2011 (Doc. 61)("MOO"), denying the Defendant's Motion to Suppress and Memorandum in Support Thereof, filed January 14, 2011 (Doc. 40)("Motion to Suppress"); (ii) whether Plaintiff United States of America had an obligation to disclose, before the suppression hearing on March 28, 2011, evidence Defendant Michael Harmon has recently obtained that he alleges undermines New Mexico Department of Public Safety Motor Transportation Division Officer Hermilo Lucero's credibility; (iii) whether that evidence impacts Lucero's credibility; (iv) whether the Court should reopen the suppression hearing; and (v) whether the Court should permit Harmon to withdraw from his guilty plea. The Court will deny all of Harmon's motions. The Court does not believe the evidence upon

which Harmon relies to challenge Lucero's credibility would serve as impeachment evidence such that the Court should reopen the suppression hearing or reconsider its decision to deny his Motion to Suppress.  Because the evidence is not exculpatory and has no impeachment value, the United States had no obligation to disclose the evidence under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). Even if the evidence is impeachment evidence, <u>Brady v. Maryland</u> did not require the United States to disclose this evidence to Harmon before his suppression hearing or before he entered his guilty plea.  Rule 16 of the Federal Rules of Criminal Procedure also did not require disclosure of this evidence, because it was not material to Harmon's defense.  Consequently, there is no sound basis for the Court to reconsider its MOO denying the Motion to Suppress.  Given that the Court will not reconsider its MOO denying the Motion to Suppress, and that the Court sees no other fair or just reason that would permit Harmon to withdraw from his guilty plea, the Court will not permit him to withdraw his guilty plea.

## FACTUAL BACKGROUND

Harmon's argument relies upon some alleged misconduct in which Lucero engaged during the investigation of another case, <u>United States v. Sheridan</u>, No. CR 10-0333.  The Court has a limited amount of evidence from that proceeding, specifically a transcript of the traffic stop that occurred in that proceeding.  <u>See</u> Transcript of Traffic Stop at 17:1-2 (dated March 18, 2010), filed July 15, 2011 (Doc. 72-1).  The Court does not have the video recording from <u>United States v. Sheridan</u>, or any reports or affidavits, generated during the investigation of that case.

At the beginning of the transcript, Lucero related: "I'm going to be on a traffic stop here off of Exit 117 on the frontage road.  It looks like a vehicle might be lost here.  Unknown 49.  I'm checking on it.  A Lincoln Navigator, silver in color."  Transcript of Traffic Stop at 2:1-5.  The transcript contains a notation that there was a "[d]og barking throughout [the] recording."  Transcript

of Traffic Stop at 2:7. Lucero then began speaking to the driver, John Sheridan, in the next portion of the transcript, asking the driver if he is "all right." Transcript of Traffic Stop at 2:8-9 ("Are you all right? Are you all right?"). The transcript indicates that Sheridan stopped his vehicle on his own because he intended to take "a leak real quick." Transcript of Traffic Stop at 2:10-11. Lucero then stated: "Well, that's why I was checking on you. I didn't know what was going on." Transcript of Traffic Stop at 2:12-13. Sheridan said that everything is fine, and Lucero then asked for his driver's license. See Transcript of Traffic Stop at 2:17-20 ("Okay. Let me get a driver's license. It kind of freaked me out. I was like what the -- what the heck is this guy doing? Where are you heading?"). Lucero determined that Sheridan was in a rental car and had come from San Francisco, California. See Transcript of Traffic Stop at 2:22-3:7. Lucero states, shortly after asking for Sheridan's license, that he was "just doing a welfare check making sure you were all right," because the area where the vehicle was stopped was "normally not for commuter traffic." Transcript of Traffic Stop at 3:12-14.

Lucero then patted down Sheridan to look for weapons. See Transcript of Traffic Stop at 3:24-4:2. Lucero determined that Sheridan had recently flown to San Francisco and was now driving back to Albuquerque, New Mexico; Lucero then asked why Sheridan was traveling in this manner. See Transcript of Traffic Stop at 4:18-5:12. Sheridan explained that he was planning on taking a vacation, but stated that his girlfriend in Albuquerque was sick and that they have rare birds -- specifically parrots -- that required some attention. See Transcript of Traffic Stop at 4:20-5:7. As Sheridan was about to leave, Lucero inquired whether he could ask Sheridan more questions, and Sheridan responded that he was in a hurry and could not answer more questions. See Transcript of Traffic Stop at 6:11-14. Lucero then stated that he was confused about Sheridan's travel plans, and asked him to explain when he left San Francisco and how long he was there. See Transcript of Traffic Stop at 6:15-7:2. Sheridan asserted that he stayed in San Francisco for a day until he heard

-3-

that his girlfriend was sick and then left later in the day, on a Thursday.  See Transcript of Traffic

Stop at 6:23-7.  Sheridan related that he planned on staying in San Francisco until Monday, that he

has relatives in San Francisco, and that he used to live there.  See Transcript of Traffic Stop at 7:24-

8:4.  Sheridan represented that his girlfriend did not join him on the trip to San Francisco, because

she is in medical school.  See Transcript of Traffic Stop at 8:5-8.  Sheridan stated that his

girlfriend's illness made her bedridden and that she could not feed the rare birds.  See Transcript of

Traffic Stop at 9:5-11.

   After talking with Sheridan, Lucero asked permission to search the vehicle on the basis that

Lucero suspected that narcotics were present; Sheridan initially refused to give permission, because

he was in a hurry.  See Transcript of Traffic Stop at 9:23-10:4.  Lucero said that he understood, but

stated that he felt that "everything you're telling me, to be honest with you, I think is a bunch of crap

because you should have just flown back to Albuquerque" rather than make an automobile trip in

the manner Sheridan explained.  Transcript of Traffic Stop at 10:7-10.  Sheridan said that there were

no flights available until Monday.  See Transcript of Traffic Stop at 10:14-15.  Lucero stated that

he "still [thought] there's some type of criminal activity" occurring, and then asked again if he could

search the vehicle.  See Transcript of Traffic Stop at 10:16-21.  The transcript indicates that several

statements that Sheridan made are inaudible, but he appears to have generally refused consent to

search the vehicle before eventually permitting Lucero's dog to sniff the vehicle for narcotics.  See

Transcript of Traffic Stop at 10:20-14:6 ("Let him take a look.").  Lucero told Sheridan that he is

not under arrest, but then relates that his dog "alert[ed] to the presence of some illegal -- odor of

illegal narcotic."  Transcript of Traffic Stop at 14:20-25.  Sheridan and Lucero then argued about

the accuracy of the dog alerting to drugs being in the vehicle.  See Transcript of Traffic Stop at 15:1-

14.  Lucero told Sheridan that he is not free to leave until Lucero can confirm or dispel whether there

are drugs in the vehicle.  See Transcript of Traffic Stop at 15:11-14.  Lucero then related that some delay will occur, because he needed to wait for another officer to conduct a full search.  See Transcript of Traffic Stop at 16:2-9.  After Lucero returned to his dispatch radio, he stated the following:

> Rick?  It's, Mary 118.  Hey, do I have another unit heading this way or -- who is it?  Oh, okay.  A Laguna unit is going to be here?  Yeah, I -- the reason being is this is -- this is -- don't put in the CA, but this is a -- whisper stop from DEA and you guys gave me the rule (inaudible) telling me and I can't really search without somebody else here and -- all right.  Thanks.

Transcript of Traffic Stop at 16:23-17:5.

## PROCEDURAL BACKGROUND

The Court will briefly recount the arguments made to suppress the evidence in the United States v. Sheridan case.  It is necessary to do so to properly decide the issues Harmon raises in his motions.  The Court will then recount the procedural history of this case.

### 1.    Suppression Proceedings in United States v. Sheridan.

In that case, Sheridan filed a motion to suppress the evidence obtained during a traffic stop.  See United States v. Sheridan, No. CR 10-0333 JC, Defendant's Motion to Suppress and Memorandum in Support Thereof at 1, filed March 18, 2010 (Doc. 26)(D.N.M.)("Sheridan Motion to Suppress").  The Sheridan Motion to Suppress attaches a partial transcript that transcribes the audio portion of the video footage of the traffic stop in that case, but attaches no other pertinent exhibits, such as a police report.  See Sheridan Motion to Suppress at 1.  Harmon has provided the Court with the transcript from that proceeding only and has not provided the Court with any audio or video footage.  Sheridan argued that there was no reasonable suspicion to stop his car as he traveled on a public thoroughfare in New Mexico on the basis that the purported "welfare check" in which Lucero engaged was "perjuriously false."  Sheridan Motion to Suppress at 1.  Sheridan

challenged the accuracy of the statements in Lucero's report that he "engaged his emergency equipment and performed a 'welfare check' of the vehicle."  Sheridan Motion to Suppress at 1-2. Harmon has not provided a copy of Lucero's report.  The Sheridan Motion to Suppress also refers to an affidavit from Task Force Officer Gloria Marcott that allegedly contained Lucero's allegedly false statements that he relayed to Marcott.  See Sheridan Motion to Suppress at 1-2.  Harmon has not provided a copy of this affidavit.

        In United States v. Sheridan, the United States filed its United States' Response to Defendant's Motion to Suppress (Doc. 26) and Motion to Provide Discovery on April 1, 2010.  See United States v. Sheridan, No. CR 10-0333 JC (Doc. 34)("Sheridan Response").  The United States responded that Sheridan was engaged in a search for a specific vehicle, specifically Sheridan's vehicle, based on information received from the DEA.  See Sheridan Response at 1-2.  The United States related that the DEA had "information provided from a proven-reliable confidential source" that informed them "that an individual named John Sheridan," whose "physical description" was available to Lucero, "was traveling along eastbound Interstate 40, driving a rented Lincoln Navigator" and carrying narcotics.  Sheridan Response at 2.  The United States represented that there was not information available regarding the color of the car or the State in which it was registered.   See Sheridan Response at 2.   The United States reported that Lucero spent "approximately 30 minutes" looking for the vehicle unsuccessfully.  Sheridan Response at 2.  The United States noted that, "[a]fter his unsuccessful search for Sheridan's vehicle, Officer Lucero resumed traffic enforcement" when he saw two separate vehicles, one of which appeared to be speeding.  Sheridan Response at 2.  The United States asserted that Lucero then "made a u-turn and attempted to follow both vehicles which he believed had exited at Exit 117," at which time "Lucero then observed a vehicle that appeared to be lost by the State of New Mexico Department of

Transportation (NM DOT) Building."  Sheridan Response at 2-3.  The United States related that "[t]he vehicle appeared to be parked or disabled as it was in the middle of the roadway," causing Lucero to engage "his emergency equipment and perform[] a 'welfare check' on the vehicle." Sheridan Response at 3.  The United States represented that "[t]he vehicle was a Lincoln Navigator and displayed a California license plate (KVK299)," and was a rental car.  Sheridan Response at 3. The United States noted that, while Lucero was talking with Sheridan and then received his identification and rental car agreement, Lucero then "realized that he had stumbled upon the person" for which he had earlier been searching.  Sheridan Response at 3.  The United States asserted that, "to keep the information provided by DEA confidential, Officer Lucero decided to treat the interaction with Sheridan consistent with his normal interactions with the motoring public." Sheridan Response at 3.

The Court notes that the Honorable John Edwards Conway, United States District Judge for the United States District Court for the District of New Mexico, never ruled on the motion to suppress filed in No. CR 10-0333, because Sheridan withdrew his motion to suppress.  See United States v. Sheridan, No. CR 10-0333, Notice of Withdrawal of Motion to Suppress [Doc. 26], filed March 24, 2010 (D.N.M.)(Doc. 50).

      **2.**      **Procedural History in This Proceeding.**

On June 10, 2010, a grand jury returned an Indictment charging Harmon: (i) in Count I, with possession with intent to distribute 500 grams and more of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); and (ii) in Count II, with possession with intent to distribute less than 50 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D).  On January 14, 2011, Harmon filed his Motion to Suppress.  See Doc. 40.  In the Motion to Suppress, he asked the Court to enter an order suppressing the evidence of alleged contraband discovered in the spare tire of the

vehicle Harmon was driving on May 14, 2010.  See Motion to Suppress at 1.  On May 6, 2011, the Court issued its MOO denying the Motion to Suppress.  See Doc 61.  The Court made the following holdings: (i) Harmon had standing to challenge the search of the vehicle he was driving; (ii) Lucero initiated a legal stop of Harmon based on Lucero's reasonable suspicion that Harmon had violated a New Mexico traffic regulation; (iii) Lucero did not stop Harmon because of his race; (iv) even if one of Lucero's motives in stopping Harmon was Harmon's race, the stop was still objectively reasonable under the Fourth Amendment to the United States Constitution, and suppression of evidence is not an appropriate remedy for a violation of the Equal Protection Clause; (v) Harmon voluntarily consented to a search of his vehicle; and (vi) Lucero's search did not exceed the scope of Harmon's consent, because Lucero had probable cause to search the spare tire on the vehicle.  See MOO at 1-2.

Harmon, pursuant to a Plea Agreement, filed May 20, 2011 (Doc. 68), pled guilty to Count I of the Indictment charging him with a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), that being possession with intent to distribute 500 grams and more of cocaine.  The Plea Agreement states that Harmon understood and agreed to waive the following rights: (i) not to plead guilty; (ii) to have a trial by jury; (iii) to confront and cross-examine adverse witnesses at trial; (iv) to be protected from compelled self-incrimination at trial; (v) to testify and present evidence on his behalf at trial; and (vi) to compel the attendance of witnesses for his defense at trial.  See Plea Agreement ¶¶ 2-3, at 1-2.  The Plea Agreement stipulates to a sentence of 60-months imprisonment.  See Plea Agreement ¶ 5, at 2.  Harmon reserved his right to appeal the Court's MOO denying his Motion to Suppress. See Plea Agreement ¶ 11, at 6-7.[1]  Harmon agreed to waive his right to appeal "his conviction and

---

[1]The Court recently appointed a new attorney for Harmon, who is now Harmon's fourth attorney.  See Memorandum Opinion and Order at 1-2, filed October 7, 2011 (Doc. 91).

imposition of the sentence" to which the parties had agreed and to waive his right to raise a "collateral attack to his conviction pursuant to 28 U.S.C. § 2255, except on the issue of counsel's ineffective assistance in negotiating or entering this plea or this waiver." Plea Agreement ¶ 10, at 6.

Harmon entered his guilty plea on May 20, 2011, before the Honorable Lorenzo F. Garcia, United States Magistrate Judge. Before accepting the guilty plea, Judge Garcia noted that the Plea Agreement contained a reservation of Harmon's right to appeal the Court's MOO denying his Motion to Suppress, and Harmon acknowledged that he wished to preserve this right. See Transcript of Plea Hearing at 3:23-4:3 (taken May 20, 2011), filed January 13, 2012 (Doc. 105)(Judge Garcia)("May 20, 2011 Tr."). Judge Garcia informed Harmon that he was under oath and that any false statements he made could be used in a perjury prosecution. See May 20, 2011 Tr. at 4:19-22 (Judge Garcia). Judge Garcia then inquired about Harmon's age and education level. See May 20, 2011 Tr. at 4:25-5:13 (Judge Garcia, Harmon). Judge Garcia asked if Harmon had even been treated for or suffered from a mental illness, mental disorder, or mental disability. See May 20, 2011 Tr. at 5:14-16 (Judge Garcia). Harmon stated that he has suffered from bipolar disorder and post-traumatic stress disorder, which he asserted are related to his service in the military. See May 20, 2011 Tr. at 5:17-23 (Harmon, Judge Garcia). Judge Garcia asked Harmon if he takes any medication for his bipolar disorder or his post-traumatic stress disorder, and Harmon asserted that he is on medication. See May 20, 2011 Tr. at 6:3-5 (Judge Garcia, Harmon). Judge Garcia asked Harmon if that medication adversely affects his cognitive abilities, and Harmon asserted that it was not affecting his abilities at the time of the plea colloquy. See May 20, 2011 Tr. at 6:6-13 (Judge Garcia, Harmon). Judge Garcia asked Harmon if he had sufficient time to consult with his attorney about the decision to plead guilty, and Harmon asserted that he received sufficient time. See May

-9-

20, 2011 Tr. at 6:23-7:1 (Court, Harmon).  Harmon stated that he had reviewed the Plea Agreement carefully with his attorney.  See May 20, 2011 Tr. at 7:2-15 (Judge Garcia, Harmon).  Harmon asserted that he understood the Plea Agreement.  See May 20, 2011 Tr. at 7:19-8:1 (Judge Garcia, Harmon).

Judge Garcia then asked Harmon whether he had reviewed the Indictment with either his current attorney or prior counsel, and Harmon asserted that he had reviewed the Indictment with one of his former attorneys and asserted that he understood the charge to which he was pleading guilty -- Count I.  See May 20, 2011 Tr. at 8:2-9:17 (Judge Garcia, Harmon).  Harmon stated that his attorney had discussed with him that the United States would need to present evidence before he could be convicted on Count I and that his attorney had discussed with him what legal defenses would be available.  See May 20, 2011 Tr. at 9:18-24 (Judge Garcia, Harmon).  Harmon stated that he was satisfied with the services and investigation of the charge that his attorneys had conducted.  See May 20, 2011 Tr. at 10:2-15 (Judge Garcia, Harmon).  Harmon stated that he had no complaints about the services his attorneys had provided to him.  See May 20, 2011 Tr. at 10:16-18 (Judge Garcia, Harmon).  Harmon noted that he had read the Plea Agreement in its entirety before signing the agreement.  See May 20, 2011 Tr. at 10:19-21 (Judge Garcia, Harmon).  He stated that the Plea Agreement represented the entirety of his agreement with the United States, and that no one had many any additional promises or assurances to him beyond those contained in the Plea Agreement. See May 20, 2011 Tr. at 10:22-11:4.  (Judge Garcia, Harmon).  Harmon acknowledged that he understood that the Court is not bound to accept the Plea Agreement and that he could withdraw his plea of guilty and proceed to trial if that event occurred.  See May 20, 2011 Tr. at 11:5-17 (Judge Garcia, Harmon).  Harmon asserted that no one had threatened or forced him into pleading guilty, and that he was pleading guilty of his own free will because he is guilty.  See May 20, 2011 Tr. at

12:2-7 (Judge Garcia, Harmon).  Harmon acknowledged that he was pleading guilty to a felony offense that carried a minimum term of five-years imprisonment and a maximum term of forty-years imprisonment.  See May 20, 2011 Tr. at 12:9-13:1 (Judge Garcia, Harmon).

Harmon acknowledged that he was, by pleading guilty, waiving the following rights: (i) the right to be presumed innocent; (ii) the right to remain silent; (iii) the right to a trial; (iv) the right to confront his accusers; (v) the right to have the United States prove its case against him beyond a reasonable doubt; (vi) the right to a jury determination of certain factors that can impact his sentence; and (vii) certain aspects of his right to appeal or collaterally attack his conviction and/or sentence as stated in the Plea Agreement.  See May 20, 2011 Tr. at 14:18-15:13 (Judge Garcia, Harmon). Harmon acknowledged that the United States would be able to prove beyond a reasonable doubt his factual admissions in the Plea Agreement.  See May 20, 2011 Tr. at 15:14-16:1 (Judge Garcia, Harmon).  Harmon then pled guilty to Count I and admitted that he committed the acts charged in Count I.  See May 20, 2011 Tr. at 15:2-9 (Judge Garcia, Harmon).  Judge Garcia then found Harmon to be: (i) fully competent and capable of entering into an informed plea; (ii) aware of the charges and of the consequences of the plea; and (iii) knowingly, willingly, and voluntarily entering his plea.  See May 20, 2011 Tr. at 16:10-17 (Judge Garcia).  Judge Garcia also found that there was an independent factual basis for the plea.  See May 20, 2011 Tr. at 16:17-18 (Judge Garcia).  Judge Garcia then accepted Harmon's guilty plea to Count I.  See May 20, 2011 Tr. at 16:19-21 (Judge Garcia).  Harmon stated that he understood everything that had been discussed during the plea colloquy.  See May 20, 2011 Tr. at 17:11-13 (Judge Garcia, Harmon).

On July 15, 2011, Harmon filed his Motion to Reconsider.  See Doc. 72.  He argues that the Court should reconsider its MOO denying his Motion to Suppress "and/or reexamine the transcript of the" March 28, 2011 hearing to determine Lucero's credibility.  Motion to Reconsider at 1.  He

-11-

asserts that the United States failed to disclose, before his suppression hearing, impeachment material that would have impeached Lucero. See Motion to Reconsider at 1-2. He asserts that, based on an excerpt from a transcript from another proceeding, "it is apparent that Hermilio[2] Lucero is directing the dispatcher not to place certain information on the" computer aided dispatch ("CAD"). Motion to Reconsider at 2. Harmon argues that "such actions are patently an attempt by Hermilio Lucero to conceal or otherwise stymie discoverable and relevant information." Motion to Reconsider at 2. Harmon asserts that "such actions" that occurred on a prior occasion "are peculiarly and specifically germane to this Matter in that there was an issue here wherein the reliability of the CADS was brought into question by Hermilio Lucero, himself." Motion to Reconsider at 3. Harmon contends that "attempts to conceal relevant information are evidence of dishonest behavior and, when the entirety of the grounds for stopping the Defendant relies on the credibility of Hermilio Lucero, it would behoove the Court to, at a minimum, reexamine the transcript" of the March 28, 2011 hearing "so as to reconsider its ruling and possibly to permit reopening testimony." Motion to Reconsider at 3.

On August 1, 2011, the United States filed its United States' Response to Defendant's Motion to Reconsider or Rehear. See Doc. 73 ("Response to Motion to Reconsider"). The United States notes that "Harmon's motion is based on the contents of a transcript of a recording made during a welfare check conducted by Officer Hermilio Lucero on the driver of a vehicle in the completely unrelated case of United States v. Sheridan, Cr. No. 10-333 JEC." Response to Motion to Reconsider at 1. The United States recounts that, "[d]uring that encounter, which occurred nearly

---

[2]Based on the transcript of the suppression hearing, the correct spelling of Hermilo Lucero's name is "Hermilo" rather than "Hermilio." Transcript of Suppression Hearing at 3:19-20 (taken March 28, 2011)(Braun)(Doc. 70). The Court will use "Hermilo."

four months prior to the events in this case, Officer Lucero told dispatch, '. . . this is -- this is -- don't put in the CAD, but this is a -- whisper stop from DEA . . . .'"   Response to Motion to Reconsider at 1-2 (quoting Transcript of Traffic Stop at 17:1-2).  The United States asserts that it had no obligation to produce this evidence to Harmon under rule 16 of the Federal Rules of Criminal Procedure or under <u>Giglio v. United States</u>, 405 U.S. 150 (1972),[3] because there is no obligation to disclose impeachment evidence before a defendant enters a guilty plea or before a hearing on a motion to suppress but rather only before trial.  <u>See</u> Response to Motion to Reconsider at 2-3 & n.2. It also asserts that "whether the Sheridan information should have been provided to Harmon by the government has no bearing on Harmon's motion, for he is now in possession of the information and the court has the discretion to reopen the suppression hearing."  Response to Motion to Reconsider at 3.  It contends that "the pertinent question is simply whether this court should exercise its discretion to reconsider its order denying Harmon's motion to suppress or reopen the hearing on the motion."  Response to Motion to Reconsider  at 3.  It argues that "[t]he court should not do so." Response to Motion to Reconsider at 3.

The United States asserts that the new information does not alter the reliability of the CAD report, given that Lucero, at the suppression hearing: (i) "noted that, in the past, he has given verbal warnings in similar situations where it is a recently purchased vehicle and the driver has the certificate of title"; and (ii) "testified that it was possible the license plate was incorrectly typed into the CAD system by dispatch."  Response to Motion to Reconsider at 4.  It argues that this new information "has no relevance to either of those scenarios" in light of Harmon's argument "in

---

[3]<u>Giglio v. United States</u> requires, under the Due Process Clause of the United States Constitution, the government to disclose to the defendant in some circumstances exculpatory evidence that may be used to impeach witnesses.  405 U.S. at 152-155.

support of his claim of racial profiling that Officer Lucero terminated the stop of the vehicle with a verbal warning after he saw Harmon, an African-American, drive past." Response to Motion to Reconsider at 4. The United States contends that "Harmon has failed to show that Officer Lucero's request in the Sheridan case was improper," given that "[h]e cites to no manual or guidelines detailing what information must be entered into CAD, or proscribing what Officer Lucero requested." Response to Motion to Reconsider at 4. Quoting a case from the United States District Court for the Southern District of Indiana, the United States describes the process of determining what appears in a CAD report:

> Neither the audio record nor the CAD report constitutes a complete historical record of an event. The audio record does not include information entered by officers in their [mobile data units]. The CAD report does not include every radio communication, but only those the dispatcher chooses to include in the report. Likewise, the CAD report may not include information an officer enters into his or her [mobile data unit] because the officer has discretion in determining whether to include the information in the CAD report.

Response to Motion to Reconsider at 5 (emphasis omitted)(quoting United States v. Cannon, No. 05-52-CR-01-T/F, 2006 WL 3206267, at *1 (S.D. Ind. Apr. 7, 2006)). The United States argues that, "[g]iven that an officer apparently has discretion in determining whether to include information in a CAD report, there is nothing inherently inappropriate about an officer choosing not to include information in CADs that could compromise an ongoing investigation." Response to Motion to Reconsider at 5. It asserts that, "[i]n the Sheridan case, Officer Lucero did not ask that inaccurate information be put into CAD," but rather "simply made a request to exclude information from CAD in order to protect the integrity of an ongoing investigation." Response to Motion to Reconsider at 5-6.

On September 21, 2011, Harmon, filing the motion pro se, filed his Motion to Withdraw Plea. See Doc. 87. He argues that the evidence he has discovered about Lucero's credibility

justifies the Court permitting him to withdraw his guilty plea.  <u>See</u> Motion to Withdraw Plea at 1.

He asserts that "a guilty plea may be withdrawn when exculpatory evidence becomes available, after

signing, but before sentencing."  Motion to Withdraw Plea at 1.

On December 22, 2011, Harmon filed his Supplemental Motion providing additional reasons

for withdrawal of his guilty plea.  <u>See</u> Doc. 102.  He notes that he has learned, following his guilty

plea, that "Lucero had a traffic-stop credibility issue that the government did not disclose to him,"

specifically that "four months earlier the officer manipulated the recording of one of his traffic

stops."  Supplemental Motion at 2.  Harmon asserts that he "has contended throughout these

proceedings that the reasons given by Officer Lucero for the traffic stop were pretextual and that

Officer Lucero went on to search his vehicle without reasonable suspicion or probable cause."

Supplemental Motion at 2.  Harmon contends that a variety of matters decided at the suppression

hearing were dependent on Lucero's credibility, including: (i) "his premature curtailment of a prior

traffic stop and his first view of Defendant"; (ii) "his observation of the vehicle driven by

Defendant"; (iii) "his purported reason for stopping Defendant and the location of the claimed

infraction that he gave as the basis for the stop"; (iv) "the overall circumstances of the area and stop

in the construction zone"; (v) "his questions and statements to Defendant and Defendant's and his

responses to each other"; (vi) "his insistently purposeful placement of Defendant at a place that was

two hundred feet . . . away from the vehicle, and out of view of his search of the vehicle"; (vii) "the

part played by [Lucero's] dog"; and (viii) "his search of the vehicle."  Supplemental Motion at 3-4.

Harmon argues that, given his "lack of knowledge of the Lucero credibility issue," his "testimonial

decisions" at the suppression hearing would have been different, including "that he would have

testified that Lucero twice pulled alongside his vehicle and looked at him before dropping back and

continuing to follow him."  Supplemental Motion at 4 n.5 (citing Affidavit of Michael Harmon, filed

December 22, 2011 (Doc. 102-1)("Harmon Aff.")).  Harmon asserts that the United States had an obligation to disclose this evidence to him before the suppression hearing.  See Supplemental Motion at 5-7.  He notes that the Court found Lucero credible in its MOO.  See Supplemental Motion at 8 (citing MOO ¶¶ 42-43, at 7).

On January 23, 2012, the United States filed its United States' Response to Defendant's Supplemental Motion to Withdraw Plea and to Re-Open Suppression Proceeding.  See Doc. 109 ("Response to Supplemental Motion").  It represents that Judge Garcia conducted a thorough plea colloquy with Harmon.  See Response to Supplemental Motion at 2.  The United States asserts that Harmon cannot meet his burden to show a fair and just reason for withdrawal of his guilty plea under the seven applicable factors outlined in United States v. Hamilton, 510 F.3d 1209, 1214 (10th Cir. 2007).  See Response to Supplemental Motion at 3.  As to the first four factors, it notes that: (i) Harmon has not asserted his innocence; (ii) "the government would suffer the prejudice inherent in prosecuting any case that is over a year and a half old"; (iii) there was a three-month delay between Harmon filing his Motion to Withdraw Plea and his guilty plea; and (iv) there will be some inconvenience to the Court based on the guilty plea withdrawal.  Response to Supplemental Motion at 3-4.  As to the factor regarding assistance of counsel, the United States notes that counsel represented Harmon when he negotiated the plea agreement and that Harmon has asserted in a conclusory manner that his counsel was ineffective in negotiating the plea agreement.  See Response to Supplemental Motion at 4-5.  As to the sixth factor, the United States notes that Harmon "does not specifically assert that his guilty plea was not knowing and voluntary."  Response to Supplemental Motion at 5-6.  It notes that "if the Court had denied the motion to suppress" even if Harmon had the evidence from the United States v. Sheridan case, "Harmon would have been in exactly the same position he was in when he decided to plead guilty."  Response to Supplemental

-16-

Motion at 5-6.  As to the seventh factor, the United States asserts that "Harmon's request to withdraw his plea is based solely on his inability to have used the Sheridan information in support of his motion suppress" and that this matter "can be adequately addressed" by the Court reconsidering its MOO denying the Motion to Suppress without wasting additional judicial resources.  Response to Supplemental Motion at 6.

On February 8, 2012, Harmon filed his Reply to United States Government' Response to Supplemental Motion to Withdraw Plea and to Re-Open Suppression Proceeding.  See Doc. 110 ("Reply").  Harmon contends that, based on a submission to Judge Conway in the United States v. Sheridan case, Lucero related to another officer that the defendant's vehicle "appeared to be lost or attempting to turn around and parked in the middle of the roadway," and that Lucero "engaged his emergency equipment and performed a 'welfare check' of the vehicle."  Reply at 2.  Harmon asserts that the Transcript of Traffic Stop reveals that "Lucero knew these representations to be false, that he falsified his report, that he misrepresented information to" another officer, "and that he knowingly allowed" the other officer "to swear to a false affidavit presented to the Court."  Reply at 2.  Harmon asserts that the video footage connected with the stop in United States v. Sheridan undercuts Lucero's assertions of what occurred at the incident.  See Reply at 3.  Harmon asserts that he has shown a fair and just reason for withdrawal of his guilty plea.  See Reply at 4-5.  He argues that the seven factors the United States has listed are not exclusive, and that he discovered this information regarding the United States v. Sheridan case in a delayed manner and then timely filed his requests to withdraw his plea.  See Reply at 5-6.  He asserts that the United States had an obligation to disclose this evidence based on the short amount of time before trial.  See Reply at 7-8.

At the hearing on March 9, 2012, Harmon stated that one of the central things the Court must consider is whether the United States should have provided the impeachment evidence at issue to

Harmon before his guilty plea and the suppression hearing.  See Transcript of Hearing at 3:8-19 (taken March 9, 2012)("Mar. 9, 2012 Tr.")(Walz).[4]  He asserted that, if the Court decides to reopen the suppression hearing and to reconsider its decision on the suppression issue, it would necessarily follow that he should have the opportunity to withdraw his guilty plea.  See Mar. 9, 2012 Tr. at 6:3-10 (Walz).  Harmon argued that the notion of fundamental fairness requires that the United States should have disclosed this information before the suppression hearing given how specifically it applies to Lucero's credibility.  See Mar. 9, 2012 Tr. at 7:10-19 (Walz).  The Court inquired whether Harmon would want to refrain from withdrawing from his Plea Agreement in case the Court decided not to change its ruling on the suppression issue, and Harmon asserted that he would prefer that the Court first rule on the suppression issues and then rule on the Motion to Withdraw Plea.  See Mar. 9, 2012 Tr. at 10:2-19 (Court, Walz).  The United States responded that Harmon has presented no direct evidence that Lucero made any false statements or acted improperly in the investigation leading up to the case of United States v. Sheridan.  See Mar. 9, 2012 Tr. at 16:17-25 (Braun).  The United States also emphasized that the United States v. Sheridan case has no relation to this one. See Mar. 9, 2012 Tr. at 16:21-25 (Braun).

The Court asked for clarification on what a whisper stop is.  See Mar. 9, 2012 Tr. at 17:1 (Court).  The United States related that a whisper stop arises from a situation where the United States Drug Enforcement Administration ("DEA") receives information from some source that a certain vehicle has narcotics in it or some other form of contraband, and relates that information to another law enforcement agency.  Mar. 9, 2012 Tr. at 17:2-8 (Braun).  The DEA then tells that law enforcement agency to develop its own proper basis to stop the vehicle and see if it can attempt to

---

[4]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

access the drugs in the vehicle.  See Mar. 9, 2012 Tr. at 17:2-11 (Braun).  The United States asserted that there is nothing inappropriate about this practice.  See Mar. 9, 2012 Tr. at 17:11-12 (Braun). The United States emphasized that courts do not consider the subjective intent of law enforcement officers for Fourth Amendment purposes.  See Mar. 9, 2012 Tr. at 17:12-22 (Braun).  The United States did not concede that the evidence at issue is impeachment evidence, but emphasized that the evidence is at best impeachment evidence, because it is not exculpatory in that it shows his innocence of the charged crime.  See Mar. 9, 2012 Tr. at 17:18-18:16 (Braun).  The United States contended that Harmon has the burden to show that the evidence is impeachment evidence and that he has failed to do so here.  See Mar. 9, 2012 Tr. at 18:17-22 (Braun).  The United States asserted that Harmon cannot show that this conduct was a prior act of dishonesty so that he can use the evidence to impeach Lucero under rule 608(b) of the Federal Rules of Evidence.  See Mar. 9, 2012 Tr. at 19:11-24 (Braun).  The United States represented that, if the Court reopens the suppression hearing, it should do so only for the limited purpose of evaluating this evidence from United States v. Sheridan.  See Mar. 9, 2012 Tr. at 20:22-21:2 (Braun).  The United States noted that, unless the Court revisits its suppression ruling, there is no basis to support withdrawal of Harmon's guilty plea. See Mar. 9, 2012 Tr. at 21:2-11 (Braun).  Harmon acknowledged that there is no reason to doubt the accuracy of the transcript from United States v. Sheridan.  See Mar. 9, 2012 Tr. at 24:9-24:16 (Court, Walz).  The Court inquired what the purpose of holding an additional hearing would be when it has a transcript available to it.  See Mar. 9, 2012 Tr. at 24:17-20 (Court).  Harmon asserted that having an opportunity to cross-examine Lucero would help flesh out what occurred and would place on the record what the definition of a whisper stop is.  See Mar. 9, 2012 Tr. at 24:21-25:9 (Walz).  The United States noted that there is no judicial finding that Lucero ever made a false statement as part of the investigation in United States v. Sheridan and no other basis for that

conclusion.  See Mar. 9, 2012 Tr. at 26:11-16 (Braun).  The United States asserted that the question is whether that statement is sufficiently dishonest to justify reopening the suppression hearing.  See Mar. 9, 2012 Tr. at 26:17-23 (Braun).

## RELEVANT LAW REGARDING MOTIONS TO RECONSIDER

"The Federal Rules of Criminal Procedure do not expressly recognize a  motion to reconsider."  United States v. Christy, 810 F.Supp.2d 1219, 1249 (D.N.M. 2011)(Browning, J.). Accord United States v. Rollins, 607 F.3d 500, 502 (7th Cir. 2010)("None of the Rules of Criminal Procedure authorizes a generic motion to reconsider; the criminal rules lack a counterpart to the motions authorized by Fed.R.Civ.P. 50(b), 52(b), or 59, though they do authorize some post-trial motions . . . that have features in common with motions under the civil rules.").  In the criminal context, however, courts ordinarily apply the same standards as those used in civil cases when addressing motions to reconsider.  See United States v. Rollins, 607 F.3d at 502 (citing United States v. Healy, 376 U.S. 75 (1964); United States v. Dieter, 429 U.S. 6 (1976); United States v. Ibarra, 502 U.S. 1 (1991))(stating that the Supreme Court of the United States has "concluded that motions to reconsider in criminal prosecutions are proper and will be treated just like motions in civil suits"); United States v. Wilson, No. 08-cr-263-KHV, 2011 WL 1706890, at *1 (D. Colo. May 5, 2011)(stating that, in the context of criminal cases, courts ordinarily apply the same standard for a motion to reconsider as the standard they use in civil cases); United States v. Matlack, No. 09-cr-531-WYD, 2010 WL 2682110, at *1 (D. Colo. July 1, 2010)(stating that other district courts in the Tenth Circuit have relied on the standards for evaluating a motion to reconsider in the civil context when address motions to reconsider in the criminal context), disapproved on other grounds by United States v. Games-Perez, 667 F.3d 1136, 1141 (10th Cir. 2012); United States v. West, No. 01-40122-01-SAC, 2002 WL 1334870, at * 1 (D. Kan. May 9, 2002)("Rarely do parties in criminal

-20-

proceedings file motions to reconsider rulings on pretrial motions. This court believes that the standards for evaluating a motion to reconsider in the civil context are relevant for evaluating a motion to reconsider in a criminal case."); United States v. D'Armond, 80 F.Supp.2d 1157, 1170 (D. Kan. 1999)("This court believes that the standards for evaluating a motion to reconsider in the civil context are relevant for evaluating a motion to reconsider in a criminal case.").

It is within a court's discretion to grant or to deny a motion to reconsider. See United States v. Wiseman, 172 F.3d 1196, 1207-08 (10th Cir. 1999). "A motion under Rule 59(e) is warranted when: (1) there has been an intervening change in the controlling law; (2) there is newly discovered evidence which was previously unavailable; or (3) it is necessary to correct clear error or prevent manifest injustice." Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000). "Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." Servants of Paraclete v. Does, 204 F.3d at 1012 (citation omitted). A district court has considerable discretion in ruling on a motion to reconsider. See Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997). A motion to reconsider is not an opportunity to rehash arguments previously addressed or to advance new arguments that could have been raised in prior briefing. See Servants of the Paraclete v. Does, 204 F.3d at 1012 ("It is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing." (citation omitted)).

Notably, neither rule 59 nor rule 60 of the Federal Rules of Civil Procedure apply to interlocutory orders a district court reconsiders before entry of final judgment. Rule 59(e) states: "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e) (emphasis added). Accord Van Skiver v. United States, 952 F.2d at 1243 ("In this case, plaintiffs' motion to reconsider was not served within ten days of the district

court's judgment."); 12 J. Moore, <u>Moore's Federal Practice</u> § 59.11[1][a], at 59-26 (3d ed. 2011)("A

motion for a new trial must be filed no later than 28 days after the entry of judgment, regardless of

when or whether the parties received notice of the entry of the judgment." (citations omitted)).  As

the note to the 1946 amendment to rule 60 emphasizes in a discussion of the choice to add the word

"final" within rule 60(b):

> The addition of the qualifying word "final" emphasizes the character of the
> judgments, orders or proceedings from which Rule 60(b) affords relief; and hence
> interlocutory judgments are not brought within the restrictions of the rule, but rather
> they are left subject to the complete power of the court rendering them to afford such
> relief from them as justice requires.

Fed. R. Civ. P. 60 note to 1946 amendment.  <u>Accord</u> 12 J. Moore, <u>supra</u> § 60.23, at 60-82 ("Rule

60(b) does not govern relief from interlocutory orders, that is to say any orders in which there is

something left for the court to decide after issuing the order."); 11 C. Wright, A. Miller & M. Kane,

<u>Federal Practice and Procedure</u> § 2852, at 233 (2d ed. 1995)("Thus, the power of a court to modify

an interlocutory judgment or order at any time prior to final judgment remains unchanged and is not

limited by the provisions of Rule 60(b).").  The United States Court of Appeals for the Tenth Circuit

has recognized that a district court has broad discretion to reconsider its interlocutory rulings before

the entry of judgment.  <u>See</u> <u>Rimbert v. Eli Lilly & Co.</u>, 647 F.3d 1247, 1251 (10th Cir.

2011)("[D]istrict courts generally remain free to reconsider their earlier interlocutory orders.").  That

discretion extends to rulings on partial summary judgment motions.  <u>See</u> <u>Fye v. Okla. Corp.</u>

<u>Comm'n</u>, 516 F.3d 1217, 1223-24 n.2 (10th Cir. 2008)("The District Court's partial summary

judgment ruling was not a final judgment. Thus, Ms. Fye's motion for reconsideration is considered

an 'interlocutory motion invoking the district court's general discretionary authority to review and

revise interlocutory rulings prior to entry of final judgment.'").

## LAW REGARDING REOPENING SUPPRESSION HEARINGS

"A ruling on whether to reopen a suppression hearing is governed by principles of jurisprudence that relate to reopening proceedings, generally." United States v. Carter, 374 F.3d 399, 405 (6th Cir. 2004), vacated on other grounds sub nom. Carter v. United States, 543 U.S. 1111 (2005). "The decision to reopen a suppression hearing is within the sound discretion of the trial court and is reviewed for abuse of discretion." United States v. Wiseman, 172 F.3d 1196, 1207-08 (10th Cir. 1999). "Generally, a court should be reluctant to reopen a case, and that principle has been applied to suppression hearings." United States v. White, 455 F.App'x 647, 650 (6th Cir. 2012)(citing United States v. Blankenship, 775 F.2d 735, 740 (6th Cir. 1985)). Relevant factors for a court to consider are "the timeliness of the motion, the character of the testimony, the effect of granting the motion, and whether the opposing party will be prejudiced by reopening the hearing." United States v. White, 455 F.App'x at 650.

The United States Court of Appeals for the Fifth Circuit has stated: "While the district court has wide discretion in determining when to reopen an evidentiary hearing, it abuses its discretion where the new evidence creates a genuine factual dispute on an outcome determinative fact." United States v. Mercadel, 75 F.App'x 983, 2003 WL 21766541, at *6 (5th Cir. 2003)(unpublished table decision). The Fifth Circuit further elaborated that a district court properly denied the request to reopen the suppression hearing when the district court found "that the new evidence would not effect its determination." United States v. Mercadel, 2003 WL 21766541, at *6. The Fifth Circuit recognized that evidence would create a genuine factual dispute on an outcome determinative fact if it "significantly bolsters" a key witness' credibility "or goes to whether [the officer] in fact had probable cause," among other matters. United States v. Mercadel, 2003 WL 21766541, at *6. Accord United States v. Atkins, 1 F.3d 1247, 1993 WL 290157, at *2 (9th Cir. 1993)(unpublished

table decision)("Because the new evidence in this case went to the heart of the magistrate judge's credibility determination underlying the denial of Atkins's suppression motion, the district court should have reopened to consider Weiss's credibility in light of the newly-discovered evidence.").

Other courts, along with the Fifth Circuit, have recognized that a district court may properly evaluate, in deciding whether to reopen the suppression hearing, the impact the new evidence would have on its decision to revisit the suppression issue:

> The government properly notified Martin that, several months after the suppression hearing, the officer had been accused of sexually assaulting a person he had detained. The district court reviewed the information provided by the Atlanta Police Department ("APD") in camera, and concluded that the allegations of sexual assault were not relevant to the court's credibility determination because there was no indication that the officer had made a false statement. After careful review of the same APD documents considered by the district court, we conclude that the district court did not abuse its discretion in refusing to reopen the suppression hearing.

United States v. Martin, 400 F.App'x 536, 537 (11th Cir. 2010)(unpublished). The United States Court of Appeals for the Fourth Circuit similarly upheld a district court's denial of a motion to reopen a suppression hearing when the new evidence would not have impacted the district court's suppression decision:

> The Defendant, Stanaus McCoy, appeals the district court's denial of a motion to reopen a suppression hearing in light of new evidence that he claims the Government withheld in violation of Brady v. Maryland. Because McCoy cannot show that the evidence was material to the suppression hearing's outcome, we affirm the district court's denial of the motion to reopen the hearing and affirm McCoy's conviction.
>
> . . . .
>
> Defense counsel moved to reopen the suppression hearing on the grounds that [newly disclosed grand jury testimony] undermined and impeached the officer's claim that when he told the tow-truck driver to pull over, the tow-truck driver "responded by driving away at a high rate of speed." The district court denied the motion, because it found that even if the tow-truck driver eased away, he still drove away to elude police. The officer, therefore, would still have had reasonable suspicion to stop McCoy.

-24-

United States v. McCoy, 348 F.App'x 900, 901-02 (4th Cir. 2009)(per curiam)(unpublished).

In the context of alleged violations of Brady v. Maryland and reopening suppression hearings, the Fourth Circuit has stated that the defendant must establish that a violation of Brady v. Maryland occurred to show that the district court abused its discretion.  See United States v. McCoy, 348 F.App'x 900, 902 (4th Cir. 2009)(unpublished)("To show that the district court abused its discretion when it refused to reopen the suppression hearing, McCoy must establish that the Government violated Brady by withholding the tow-truck driver's testimony.").  The United States Court of Appeals for the Second Circuit similarly stated, in the context of alleged violations of Brady v. Maryland, that the district court did not err in denying a motion to reopen the suppression hearing when there was no violation of Brady v. Maryland:

> Nosworthy's Rule 33 motion claimed that this testimony -- which his attorney discovered online after the trial -- constituted newly discovered evidence and that the government's failure to disclose it earlier in the proceedings violated its obligations under Brady v. Maryland; the Jencks Act; and Federal Rule of Criminal Procedure 26.2.  Nosworthy accordingly asked the district court to re-open his suppression hearing and hold a new trial.  The court denied Nosworthy's motion, holding that Nosworthy had not proven a violation of Brady, the Jencks Act, or Rule 26.2, and that the Esterine testimony did not constitute newly discovered evidence for purposes of Rule 33.
>
> . . . .
>
> Second, the district court correctly found that the government was not required to turn over the [United States v. ]Esterine[, No. 07-CR-258, 2007 WL 3274887 (E.D.N.Y. Nov. 5, 2007)] testimony under Brady.  For the failure to disclose evidence to be a Brady violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued."  We agree with the district court that the Esterine testimony was neither exculpatory nor impeaching.  It concerned a wholly unrelated criminal arrest, and the magistrate judge in Esterine had specifically found the officers' testimony credible.

United States v. Nosworthy, No. 11-2888-cr, 2012 WL 1193715, at *4 (2d Cir. Apr. 11,

2012)(unpublished)(alterations in original)(citations omitted).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE IN CRIMINAL CASES

During a criminal prosecution, the Federal Rules of Criminal Procedure and the United States Constitution impose upon the United States an obligation to disclose certain evidence to a criminal defendant. Rule 16 of the Federal Rules of Criminal Procedure is one source that imposes such a duty on the United States. The Due Process Clause of the United States Constitution is another source imposing a duty to disclose on the United States.

**1.     Rule 16.**

Rule 16 of the Federal Rules of Criminal Procedure provides:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

(i)      the item is material to preparing the defense;

(ii)     the government intends to use the item in its case-in-chief at trial; or

(iii)    the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).

Criminal defendants may not, however, embark on a "broad or blind fishing expedition among documents possessed by the Government." Jencks v. United States, 353 U.S. 657, 667 (1957)(quoting Gordon v. United States, 344 U.S. 414, 419 (1953)). Rule 16(a)(2) provides, in part, that rule 16 "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2). The Supreme Court has interpreted the term "defense" in this statute as referring to "an argument in response to

-26-

the prosecution's chase in chief." United States v. Armstrong, 517 U.S. 456, 462 (1996)("We reject this argument, because we conclude that in the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief.").

##### 2.     Due Process Clause.

"The Due Process Clause requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment." United States v. Padilla, No. 09-3598, 2011 WL 1103876, at *5 (D.N.M. Mar. 14, 2011)(Browning, J.).   In Brady v. Maryland, the Supreme Court explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.  In Giglio v. United States, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See 405 U.S. at 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985))); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence.").[5]  Finally, the Supreme Court has refined Brady

---

[5]There may be a conflict in some Tenth Circuit cases where the Tenth Circuit refers to impeachment evidence as exculpatory evidence and in other cases where it refers to impeachment evidence as distinct from exculpatory evidence.  Compare United States v. Abello-Silva, 948 F.2d at 1179 ("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."), with United States v. Torres, 569 F.3d 1277, 1282 (10th Cir. 2009)("Impeachment evidence is considered exculpatory for Brady purposes.").   Nevertheless, in the context of voluntariness of guilty pleas, the Tenth Circuit has drawn a distinction between evidence that has only impeachment value, and evidence that has exculpatory value as to the defendant's guilt or

v. Maryland and clarified that it is not necessary that a defendant request exculpatory evidence; "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request.");  United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").  "[T]he Due Process Clause does not require the government to disclose before trial the names of its witnesses, just so the defense can

---

innocence for the charged offense:

> Ruiz is distinguishable in at least two significant respects.  First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence.  Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea.  Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings.  By holding in Ruiz that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a Brady violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

United States v. Ohiri, 133 F.App'x 555, 562 (10th Cir. 2005)(unpublished).  In the context of voluntariness of guilty pleas, the Supreme Court has likewise drawn the same distinction by stating: "It is particularly difficult to characterize impeachment information as critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information may, or may not, help a particular defendant."  United States v. Ruiz, 536 U.S. 622, 630 (2002).  Because it is necessary to do so to resolve the issues raised by Harmon's motions, and because both the Supreme Court and the Tenth Circuit have drawn a distinction between exculpatory and impeachment evidence in the context of voluntariness of guilty pleas, the Court will also draw a distinction between the two categories of evidence.

-28-

have sufficient time to investigate their backgrounds for impeachment information." United States v. Ashley, 274 F.App'x 693, 697 (10th Cir. 2008). See Weatherford v. Bursey, 429 U.S. 545, 559 (1977)("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably.").

### a.   Timing of the Disclosure.

The obligation of the prosecution to disclose evidence under Brady v. Maryland can vary depending on the phase of the criminal proceedings and the evidence at issue. As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in Brady v. Maryland." United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009). The Tenth Circuit has recognized that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." United States v. Burke, 571 F.3d at 1054. "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" United States v. Burke, 571 F.3d at 1054. As the Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with Brady, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

United States v. Burke, 571 F.3d at 1054. Notably, "not every delay in disclosure of Brady material is necessarily prejudicial to the defense." United States v. Burke, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." United States v. Burke, 571 F.3d at 1056. Courts

-29-

should, "[w]hen assessing the materiality of Giglio information, . . . consider the significance of the suppressed evidence in relation to the entire record." United States v. Gonzalez-Montoya, 161 F.3d 643, 650 (10th Cir. 1998).

When a prosecutor's obligations under Brady v. Maryland are triggered, however, they "continue[] throughout the judicial process." Douglas v. Workman, 560 F.3d at 1173. For instance, the obligation to disclose material under Brady v. Maryland can arise during trial. See United States v. Headman, 594 F.3d at 1183 (10th Cir. 2010)("Although Brady claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway."). Additionally, the disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(applying Brady v. Maryland to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that the restrictions from Brady v. Maryland do not require "preguilty plea disclosure of impeachment information." United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not."). The Supreme Court recognized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." United States v. Ruiz, 536 U.S. at 632 (emphasis in original). It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632. It stated: "It is particularly difficult to

-30-

characterize impeachment information as critical information of which the defendant must always

be aware prior to pleading guilty given the random way in which such information may, or may not,

help a particular defendant."  United States v. Ruiz, 536 U.S. at 630.  It further related:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court concluded that "a constitutional

obligation to provide impeachment information during plea bargaining, prior to entry of a guilty

plea, could seriously interfere with the Government's interest in securing those guilty pleas that are

factually justified, desired by defendants, and help to secure the efficient administration of justice."

United States v. Ruiz, 536 U.S. at 630.

The Tenth Circuit has reiterated these principles from United States v. Ruiz:

> Despite these representations of a knowing and voluntary plea in the plea agreement and at the plea colloquy, Mr. Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence.  The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement.  Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary."  Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances-even though the defendant may not know the specific detailed consequences of invoking it."  Mr. Johnson understood that he was giving up his right to cross examine government witnesses. He therefore generally knew what he was giving up, and his appeal waiver was not unknowing or involuntary.

United States v. Johnson, 369 F.App'x 905, 906 (10th Cir. 2010)(unpublished).  The Tenth Circuit

has stated in another case: "As the Supreme Court stated in United States v. Ruiz, '[T]he

Constitution does not require the Government to disclose material impeachment evidence prior to

entering a plea agreement with a criminal defendant.'" United States v. Dighera, 217 F.App'x 826, 828 (10th Cir. 2007)(unpublished)(alteration in original)(citation omitted). Nevertheless, the Tenth Circuit, in an unpublished opinion, held that the standard outlined in United States v. Ruiz does not apply to exculpatory evidence but rather only to impeachment evidence:

> Ruiz is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence. Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in Ruiz that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a Brady violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

United States v. Ohiri, 133 F.App'x 555, 562 (10th Cir. 2005). The Tenth Circuit qualified its holding in United States v. Ohiri, stating that the case presented "unusual circumstances." United States v. Ohiri, 133 F.App'x at 562.

Circuit courts have split on the issue whether Brady v. Maryland's restrictions apply to suppression hearings, although it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea. In an unpublished opinion, the Tenth Circuit, without discussing whether Brady v. Maryland applies to a suppression hearing, rejected a defendant's argument that the prosecution violated Brady v. Maryland by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material. See United States v. Johnson, 117 F.3d 1429, 1997 WL 381926 at *3 (10th Cir. 1997)(unpublished table decision). Specifically, the

Tenth Circuit found:

> Given the circumstances, and applying <u>Bagley</u>, [a case where the Supreme Court stated that evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,] to our examination of the record, we conclude that disclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression hearing would have been different. First, we question whether the evidence in question would have been admitted at the suppression hearing. Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined. Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a <u>Brady</u> violation.

<u>United States v. Johnson</u>, 1997 WL 381926, at *3 (citation omitted). The United States Court of Appeals for the District of Columbia has recognized that "it is hardly clear that the <u>Brady</u> line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet <u>Brady</u> rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'" <u>United States v. Bowie</u>, 198 F.3d 905, 912 (D.C. Cir. 1999). Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from <u>United States v. Bowie</u>. <u>See</u> <u>United States v. Bullock</u>, 130 F.App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the <u>Brady</u> issues at stake here."). The Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held, before the Supreme Court issued its <u>United States v. Ruiz</u> decision, that <u>Brady v. Maryland</u> restrictions apply to suppression hearings. <u>See</u> <u>United States v. Barton</u>, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in <u>Brady</u> and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); <u>Smith v. Black</u>, 904 F.2d

950, 965-66 (5th Cir. 1990)("Timing is critical to proper <u>Brady</u> disclosure, and objections may be made under <u>Brady</u> to the state's failure to disclose material evidence prior to a suppression hearing."), <u>vacated on other grounds</u>, 503 U.S. 930 (1992)). The United States Court of Appeals for the Seventh Circuit held that, under its precedent and the law from other circuits, it was not "obvious" for clear-error purposes that "<u>Brady</u> disclosures are required prior to suppression hearings." <u>United States v. Scott</u>, 245 F.3d 890, 902 (7th Cir. 2001).

### b.   **Material Exculpatory Evidence.**

The holding in <u>Brady v. Maryland</u> requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. at 682. <u>See</u> <u>United States v. Allen</u>, 603 F.3d 1202, 1215 (10th Cir.), <u>cert denied</u> 131 S.Ct. 680 (2010). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." <u>United States v. Fleming</u>, 19 F.3d 1325, 1331 (10th Cir. 1994). The Tenth Circuit has also found that "[d]uplicative impeachment evidence is not material." <u>Douglas v. Workman</u>, 560 F.3d at 1173. "To be material under <u>Brady</u>, undisclosed information or evidence acquired through that information must be admissible." <u>Banks v. Reynolds</u>, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting <u>United States v. Kennedy</u>, 890 F.2d 1056, 1059 (9th Cir. 1989)).

The Supreme Court, in <u>Cone v. Bell</u>, 556 U.S. 449 (2009), recently noted:

Although the Due Process Clause of the Fourteenth Amendment, as interpreted by <u>Brady</u>, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's

-34-

ethical or statutory obligations.  See Kyles, 514 U.S. at 437 ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)").  See also ABA Model Rule of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

556 U.S. at 470 n.15.  Favorable evidence is only material and thus subject to mandated disclosure when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Cone v. Bell, 556 U.S. at 470 (quoting Kyles v. Whitley, 514 U.S. at 435).

The burden is on the United States to produce exculpatory materials; the burden is not on the defendant to first point out that such materials exist.  See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached."); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, 2011 WL 1103876, at *6.  The United States' good faith or bad faith is irrelevant.  See Brady v. Maryland, 373 U.S. at 87; United States v. Quintana, 673 F.2d at 299 ("Under Brady, the good or bad faith of government agents is irrelevant.").  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence."  Kyles v. Whitley, 514 U.S. at 439.  The United States has an obligation to "volunteer exculpatory evidence never requested, or requested only in a general

way," although the obligation only exists "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial." Kyles v. Whitley, 514 at 433 (internal quotation marks omitted). On the other hand, "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995). Additionally, "[t]he constitution does not grant criminal defendants the right to embark on a broad or blind fishing expedition among documents possessed by the" United States. United States v. Mayes, 917 F.2d 457, 461 (10th Cir. 1990)(quoting Jencks v. United States, 353 U.S. at 667)(internal quotation marks omitted).

      **c.**    **Evidence Must Be in the United States' Possession.**

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'" United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)). Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, No. CR 03-2062, 2005 U.S. Dist. LEXIS 21928, at *2 (D.N.M. Aug. 29, 2005)(Browning, J.). On the other hand, "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984). Under Brady v. Maryland, "[a] prosecutor must disclose information of which it has knowledge and access." United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)). "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" United States v.

Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).  A prosecutor does not have a duty, however, to obtain evidence from third parties.  See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady v. Maryland does not oblige the government to obtain evidence from third parties).

### d.      Standard for Permitting New Trial.

Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.  See Fed. R. Crim. P. 33(a).  Motions for new trials are, however, disfavored and "should only be granted with great caution."  United States v. Quintanilla, 193 F.3d 1139, 1146 (10th Cir. 1999)(reversing district court's grant of a new trial motion based in part on alleged violations under Brady v. Maryland).  A defendant seeking a new trial based on an alleged Brady v. Maryland violation has the burden to demonstrate that: "[i] the prosecution suppressed evidence, [ii] the evidence was favorable to the defendant, and [iii] the evidence was material."  United States v. Velarde, 485 F.3d 553, 558 (10th Cir. 2007).  Accord United States v. Gould, No. 03-2274, 2011 WL 1103805, at *6 (D.N.M. Mar. 16, 2011)(Browning, J.), aff'd on other grounds by 672 F.3d 930 (10th Cir. 2012).  "Evaluation of a Brady claim asserted in a motion for a new trial involves an application of [those] three elements . . . and not the five-prong . . . test utilized in typical newly discovered evidence claims."  United States v. Quintanilla, 193 F.3d at 1149 n.10 (citation omitted).  "While an open file policy may suffice to discharge the prosecution's Brady obligations in a particular case, it often will not be dispositive of the issue."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 828 (emphasis in original)(internal quotation marks omitted).

> On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more.  But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached.  This in turn means

> that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

Kyles v. Whitley, 514 U.S. at 437 (citation omitted).

## LAW REGARDING RULE 608 EVIDENCE

Rule 608 provides certain mechanisms for attacking witnesses' character for truthfulness or untruthfulness. See Montoya v. Sheldon, No. 10-0360, 2012 WL 1132505, at *5 (D.N.M. Mar. 20, 2012)(Browning, J.); United States v. Huerta-Rodriguez, 83 Fed. R. Evid. Serv. 681, 2010 WL 3834061, at *7 (D.N.M. 2010)(Browning, J.). Rule 608(a) states:

> A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

Fed. R. Evid. 608(a). "Under Federal Rule of Evidence 608(b), specific unrelated instances of a witness's prior misconduct may be used to impeach the witness at the discretion of the court, however, only to the extent the misconduct reflects on the witness's character for truthfulness."

United States v. Beltran-Garcia, 338 F.App'x 765, 770 (10th Cir. 2009)(unpublished). Rule 608(b) lays out the mechanics of using evidence of specific instances of conduct for impeachment purposes:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
>
>     (1)    the witness; or
>
>     (2)    another witness whose character the witness being cross-examined has testified about.

> By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness.

Fed. R. Evid. 608(b). As the advisory committee notes to this rule further flesh out, rule 408 "bars evidence of specific instances of conduct of a witness for the purpose of attacking or supporting his credibility" except in the following circumstances: "(1) specific instances are provable when they have been the subject of criminal conviction, and (2) specific instances may be inquired into on cross-examination of the principal witness or of a witness giving an opinion of his character for truthfulness." Fed. R. Evid. 608 advisory committee's note to 1972 proposed rule.

"Though Rule 608 does not explicitly specify how the trial court should exercise its discretion, the discretion must be exercised within the ambit of the other rules of evidence, including Rules 401, 402, and 403, which address the relevance and probative value of possible evidence." United States v. Beltran-Garcia, 338 F.App'x at 770.

> Although 608(b) of the Federal Rules of Evidence does state that specific instances of misconduct may be admissible to impeach a witness, that rule does not require or imply that every negative bit of evidence existing concerning a witness may be dragged into a case no matter how remote or minor the alleged misconduct.

United States v. Lafayette, 983 F.2d 1102, 1106 (D.C. Cir. 1993). Rule 608 was amended in 2003 "to clarify that the absolute prohibition on extrinsic evidence applies only when the sole reason for proffering that evidence is to attack or support the witness' character for truthfulness," and not "to bar extrinsic evidence for bias, competency and contradiction impeachment." Fed. R. Evid. 608 advisory committee's note to 2003 amendment. Professors Charles Alan Wright and Victor James Gold recognized that, before the 2003 amendment, the "greater weight of authority" held that "Rule 608 regulates only the admissibility of character evidence and that subdivision (b) should not be read literally." 28 C. Wright & V. Gold, Federal Practice and Procedure § 6117, at 86 (1993 & Supp.

2011).  Professors Wright and Gold confirm that, as a result of the 2003 amendment, rule 608(b) "has been amended to make clear that it applies only to extrinsic evidence of conduct offered for the purpose of proving character for truthfulness or untruthfulness."  28 C. Wright & V. Gold, supra § 6117, at 14 (Supp. 2011).

## LAW REGARDING WITHDRAWAL OF GUILTY PLEAS

Rule 11(d)(2)(B) of the Federal Rules of Criminal Procedure governs a motion to withdraw a guilty plea before the imposition of a sentence.  Rule 11(d)(2)(B) provides that a defendant may withdraw a plea if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B).  Defendants do not have an absolute right to withdraw a guilty plea. See United States v. Siedlik, 231 F.3d 744, 748 (10th Cir. 2000).  District courts, however, have broad discretion in determining whether to grant  motions to withdraw  pleas.  See United States v. Wright, 392 F.App'x 623, 627 (10th Cir. 2010)(unpublished)("We review the district court's denial of a motion to withdraw a guilty plea for an abuse of discretion."); United States v. Garcia, 577 F.3d 1271, 1274 (10th Cir. 2009)("Although a motion to withdraw a plea prior to sentencing should be freely allowed, we will not reverse unless the defendant can show that the court acted unjustly or unfairly.").  The Tenth Circuit has repeatedly held that, when a defendant moves to withdraw a guilty plea before sentencing, the court must assess whether there is a fair and just reason for withdrawal based on the following factors:

> (1) whether the defendant has asserted his innocence; (2) whether withdrawal would prejudice the government; (3) whether the defendant delayed in filing his motion, and, if so, the reason for the delay; (4) whether withdrawal would substantially inconvenience the court; (5) whether close assistance of counsel was available to the defendant; (6) whether the plea was knowing and voluntary; and (7) whether the withdrawal would waste judicial resources.

United States v. Yazzie, 407 F.3d 1139, 1142 (10th Cir. 2005).  While treated sometimes as an

eighth factor, a district court may properly consider "the likelihood of conviction" when assessing whether to permit withdrawal of a guilty plea. United States v. Carr, 80 F.3d at 421 n.5 (recognizing that the Tenth Circuit has "suggested an additional factor to consider: the likelihood of conviction" (citing United States v. Glover, 911 F.2d 419, 421 (10th Cir. 1990)). Accord United States v. Begaye, No. 10-0456, 2012 WL 119602, at *10 (D.N.M. Jan. 3, 2012)(Browning, J.)("The Court believes the consideration of likelihood of conviction is relevant here, either in the context of the two factors of whether withdrawal would substantially inconvenience the Court or waste judicial resources, or as an additional factor.").

The defendant bears the burden of demonstrating a "fair and just reason" for withdrawal of the plea. United States v. Griffin, 191 F.App'x 699, 701 (10th Cir. 2006)(unpublished). In assessing a motion to withdraw a guilty plea, courts should give particular weight to knowing and voluntary statements that the defendant made under oath at the plea hearing. See United States v. Messino, 55 F.3d 1241, 1248 (7th Cir. 1995). In reaching their decisions, courts should also remember that "[t]he plea of guilty is a solemn act not to be disregarded because of belated misgivings about [its] wisdom." United States v. Morrison, 967 F.2d 264, 268 (8th Cir. 1992). While the right to withdraw a guilty plea before sentencing, therefore, is not absolute, the court should allow relief when the defendant can show a fair and just reason for withdrawal. See United States v. Jim, No. 10-2653, 2011 WL 6013093, at *6-7 (D.N.M. Nov. 22, 2011)(Browning, J.).

## ANALYSIS

The Court will deny all of Harmon's motions. The Court does not believe the evidence upon which Harmon relies to challenge Lucero's credibility would serve as impeachment evidence such that the Court should reopen the suppression hearing or reconsider its decision to deny his Motion to Suppress. Because the evidence is not exculpatory and has no impeachment value, the United

States had no obligation to disclose the evidence under <u>Brady v. Maryland</u>.  Even if the evidence

is impeachment evidence, <u>Brady v. Maryland</u> did not require the United States to disclose this

evidence to Harmon before his suppression hearing or before he entered his guilty plea.  Rule 16 of

the Federal Rules of Criminal Procedure also did not require disclosure of this evidence, because

it was not material to Harmon's defense.  Consequently, there is no sound basis for the Court to

reconsider its MOO denying the Motion to Suppress.  Given that the Court will not reconsider its

MOO denying the Motion to Suppress, and that the Court sees no other fair or just reason that would

permit Harmon to withdraw from his guilty plea, the Court will not permit him to withdraw his

guilty plea.

## I.      THE EVIDENCE UPON WHICH HARMON RELIES DOES NOT HAVE IMPEACHMENT VALUE.

To justify reconsideration of the Court's MOO denying his Motion to Suppress and to

support his request to withdraw his guilty plea, Harmon relies on a transcript from another case,

<u>United States v. Sheridan</u>, which he asserts contains evidence that would impeach Lucero's

character truthfulness based on allegedly improper conduct during a traffic stop.  Given that the

Court has only the transcript of the traffic stop in <u>United States v. Sheridan</u> available to it, that

transcript is the only evidence available for the Court to consider to assess Lucero's conduct.

Harmon conceded at the March 9, 2012 hearing that the transcript is an accurate transcription.  <u>See</u>

Mar. 9, 2012 Tr. at 24:9-24:16 (Court, Walz).  The Court does not have the video recording from

<u>Untied States v. Sheridan</u>, or any reports or affidavits, generated during the investigation of that

case.

Harmon argues that it is necessary to reopen the suppression hearing to have Lucero explain,

on the record, the definition of a whisper stop.  The Court does not believe that step is necessary,

because the Court and other courts have already provided definitions for a whisper stop.  For

instance, the Court recognized in a prior case that "[a] whisper stop is where law enforcement

officers stop a vehicle, but disguise that the stop is anything other than a routine traffic stop."

United States v. Hernandez-Mejia, No. 05-469, 2008 WL 5978897, at *2 n.3 (D.N.M. Nov. 19,

2008)(Browning, J.).  The United States Court of Appeals for the Eleventh Circuit has discussed a

whisper stop in the following context:

> That afternoon, Agent Kenneybrew contacted GSP and asked them to prepare a
> 'whisper stop,' in which ICE tells a local law enforcement agency that a vehicle
> contains drugs or other contraband but asks the local agency to develop its own
> probable cause for the stop to avoid compromising the federal investigation.

United States v. Sanders, 668 F.3d 1298, 1303 (11th Cir. 2012).  At the March 9, 2012 hearing, the

Court asked for clarification on what a whisper stop is.  See Mar. 9, 2012 Tr. at 17:1 (Court).  The

United States related that a whisper stop arises from a situation where the DEA receives information

from some source that a certain vehicle has narcotics in it or some other form of contraband, and

relates that information to another law enforcement agency.  See Mar. 9, 2012 Tr. at 17:2-8 (Braun).

The Court believes those definitions of the term whisper stop from other cases are adequate to

properly decide the issues before it.

### A. ON THE RECORD BEFORE THE COURT, LUCERO DID NOT COMMIT ANY FOURTH AMENDMENT VIOLATIONS DURING THE INVESTIGATION OF THE UNITED STATES V. SHERIDAN CASE.

The Court recognizes that the United States' explanation in the Sheridan Response of how

the events transpired during the traffic stop in the United States v. Sheridan investigation are not

evidence.  Cf. United States v. Rogers, 556 F.3d 1130, 1141 (10th Cir. 2009)("Moreover, the jury

was properly instructed that closing arguments are not evidence and that Defendant should only be

convicted on the basis of evidence submitted at trial."); Tenth Circuit Pattern Jury Instructions

-43-

Criminal § 1.06, at 13 (2011)(Evidence -- Defined)("The lawyers' statements and arguments are not evidence."). Taking the United States' explanation in the Sheridan Response solely as an argument rather than evidence, the explanation is consistent with the Transcript of Traffic Stop available to the Court.

The Court notes that, as a preliminary matter, the parties have not addressed whether a Fourth-Amendment violation an officer commits in another case qualifies as proper impeachment evidence under rule 608(b).[6]  "Under Federal Rule of Evidence 608(b), specific unrelated instances of a witness's prior misconduct may be used to impeach the witness at the discretion of the court, however, only to the extent the misconduct reflects on the witness's character for truthfulness." United States v. Beltran-Garcia, 338 F.App'x at 770.  Given that the Fourth-Amendment analysis is objective in nature, disregarding an officer's subjective intentions, it is difficult to characterize Fourth-Amendment violations as per se bearing on an officer's character for truthfulness.  See Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006)("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" (alteration in original)).  Additionally, some conduct that is improper for Fourth-Amendment purposes does not necessarily bear on an officer's character for truthfulness.  For instance, the use of excessive force would not likely bear on an officer's character for truthfulness, because "[v]iolent crimes . . . are irrelevant to a witness's character for truthfulness." United States v. Parker, 133 F.3d 322, 327 (1998).  Nevertheless, some Fourth-

_____

[6]The Court acknowledges that the Federal Rules of Evidence do not generally apply at suppression hearings, see United States v. Rodriguez, No. 11-2158, 2011 WL 673949, at *1 (D.N.M. Dec. 8, 2011)(Browning, J.)("In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court."), but analogizes to rule 608(b) because the evidence might also come in if a trial were to occur and because rule 608(b) precedent provides useful analogies for evaluating the weight of impeachment evidence.

Amendment violations, such as lying under oath or fabricating evidence to convince a magistrate that probable cause exists, would likely bear on an officer's character for truthfulness.  See United States v. Leake, 642 F.2d 715, 718 (4th Cir. 1981)("Rule 608 authorizes inquiry only into instances of misconduct that are 'clearly probative of truthfulness or untruthfulness,' such as perjury, fraud, swindling, forgery, bribery, and embezzlement.").

After having consulted the transcript from the traffic stop in United States v. Sheridan, the Court concludes that, on the limited record before it, none of Lucero's conducted resulted in a Fourth-Amendment violation.  The Tenth Circuit has recognized that "the community caretaking exception to the warrant requirement is applicable only in cases involving automobile searches." United States v. Bute, 43 F.3d 531, 535 (10th Cir. 1994).  The United States v. Sheridan case involved an automobile search, so the community caretaking function could potentially apply. When relying upon a community caretaking function, an officer may in some circumstances permissibly, under "concern for the safety of the general public" engage in some warrantees conduct, including searches.  Cady v. Dombrowski, 413 U.S. 433, 447-48 (1973)("Where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we hold that the search was not 'unreasonable' within the meaning of the Fourth and Fourteenth Amendments.").  As the Tenth Circuit has stated: "[O]fficers may effect a brief non-investigatory detention in the exercise of their community caretaking functions, regardless of suspected criminal activity, when articulable facts indicate the need 'to assure the safety of the public and/or the individual.'"  Novitsky v. City of Aurora, 491 F.3d 1244, 1253 (10th Cir. 2007). Lucero's description of the conduct occurring in the parking lot where Sheridan had his vehicle positioned in a strange manner could lead a reasonable officer to believe that someone may have been injured, lost, or otherwise in distress -- thus justifying a "brief non-investigatory detention."

Novitsky v. City of Aurora, 491 F.3d at 1253.

As to the seizure of Sheridan's license, officers generally only need reasonable suspicion to obtain an individual's license.  See United States v. Lopez, 443 F.3d 1280, 1282, 1286 (10th Cir. 2006)(holding reasonable suspicion to be the proper standard for the seizure of a driver's license when officers approach defendants and their parked car by the side of the road).  Lucero's description of the conduct occurring in the parking lot where Sheridan had his vehicle positioned in a strange manner could serve as the basis for reasonable suspicion that the vehicle operator was intoxicated in some manner.[7]  Sheridan may have been consuming either alcohol or some other substance -- including a prescription drug that may have no odor.  That Sheridan stated that he had stopped to urinate would be a fact that a reasonable officer might use to conclude that Sheridan had been drinking alcohol.  By the same token, there could have been illegal substances in the vehicle. "For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).  This standard is met by information "falling 'considerably short' of a preponderance standard."  United States v. Winder, 557 F.3d at 1134.

---

[7]For reasonable suspicion to exist, officers are not required "to observe the equivalent of direct evidence of a particular specific crime" as long as "there is reasonable suspicion of criminal activity."  United States v. Pack, 612 F.3d 341, 357 (5th Cir. 2010).  Likewise, to establish that reasonable suspicion exists, officers have no obligation to articulate a specific offense which they believe the suspect may have committed.  See United States v. Ceballos, 355 F.App'x 226, 239 (10th Cir. 2009)(not requiring evidence of a specific crime when the defendant "showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home"); United States v. Reyes-Vencomo, No. 11-2563, 2012 WL 843611, at *16 (D.N.M. Feb. 13, 2012)(Browning, J.)(stating that, in United States v. Ceballos, "[t]he Tenth Circuit did not require the officer to identify the particular crime of which he she had reasonable suspicion, or even to acknowledge that he had reasonable suspicion").

As Lucero continued to question Sheridan, Lucero acquired more information that gave rise to a reasonable suspicion that there might be illegal contraband in the vehicle or that Sheridan was engaged in some other form of criminal activity. Most notably, Sheridan provided Lucero with questionable travel plans. An officer "may ask a motorist about his or her travel plans" as "part of a legitimate traffic stop." United States v. Kitchell, 653 F.3d 1206, 1219 (10th Cir. 2011). Sheridan informed Lucero that he was driving a rental car. Sheridan related that: (i) he had originally flown to San Francisco; (ii) was now driving back to Albuquerque; (iii) he had left in the late afternoon on a Thursday; (iv) and had originally planned to stay in San Francisco until the upcoming Monday. The reason that Sheridan stated he was returning earlier than originally planned was because his girlfriend had become ill and could not feed their rare birds. While not outside the realm of possibility, Sheridan's story was odd and potentially implausible. Courts "evaluate the officer's conduct 'in light of common sense and ordinary human experience,' deferring to 'the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." United States v. Stephenson, 452 F.3d 1173, 1176 (10th Cir. 2006). Lucero expresses his concern about the dubious nature of these travel plans when he tells Sheridan that "everything you're telling me, to be honest with you, I think is a bunch of crap because you should have just flown back to Albuquerque" rather than make an automobile trip in the manner Sheridan explained. Transcript of Traffic Stop at 10:7-10.

The distance between San Francisco and Albuquerque is approximately 1,086 miles traveling on Interstate Highway 40.[8] While a person, leaving in the late afternoon on a Thursday, could

---

[8]See Google Maps, http://maps.google.com/maps?saddr=San+Francisco,+CA&daddr=87102&hl=en&sll=36.270945,-114.533225&sspn=12.969273,19.753418&geocode=FVJmQAIdKAe0-CkhAGkAbZqFgDH_rXbwZxNQSg%3BFVlaFwId4bKk-SlFV-crjgwihzFA1XhMoGa7tg&mra=ls&t=m&z=6 (last visited May 7, 2012). Courts can properly take judicial notice of distances

conceivably make it to Albuquerque by approximately noon on Friday driving that distance non-stop, a regular traveler would likely take at least two to three days to travel that distance -- particularly when driving alone like Sheridan.  It would appear strange to a reasonable officer that, given the length of the trip and that Sheridan had originally planned on flying back on Monday, it was necessary to drive from San Francisco to Albuquerque to feed some rare birds that someone nearer to Albuquerque could have possibly fed.  As the Tenth Circuit has explained in the context of a driver providing implausible or dubious travel plans:

> Once Officer Heim received these dubious and inconsistent answers to his questions, he developed reasonable, articulable suspicion that the two men might be engaged in criminal activity, thereby justifying their continued detention for further investigation.  We have held that implausible or contradictory travel plans can contribute to a reasonable suspicion of illegal activity.  We have also stated that courts should "defer to 'the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'"  In this case, the contradictions, implausibilities and potentially evasive actions of Appellant and Galindo–Diaz would cause an experienced officer to become suspicious that the men were engaged in criminal activity.

United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001)(citations omitted).  Lucero's suspicions would have been strengthened by Sheridan's use of a rental car, because "the use of a rental car can potentially contribute to an officer's reasonable suspicion of drug trafficking."  United States v. Kitchell, 653 F.3d at 1221.  Looking at the "totality of the circumstances" surrounding the investigative detention, the Court believes Lucero acquired reasonable suspicion of criminal activity after learning Sheridan's travel plans.  United States v. Kitchell, 653 F.3d at 1221 ("[W]e conclude that the totality of the circumstances -- particularly the inconsistencies in the defendants' purported

---

between locations.  See Citizens for Peace in Space v. City of Colo. Springs, 477 F.3d 1212, 1218 n.2 (10th Cir. 2007)("Although the record is not entirely clear, it appears that Checkpoint 1 was approximately 310 yards from the front of the International Conference Center.  We take judicial notice of this distance." (citation omitted))

travel plans as relayed to Trooper Hyde -- gave rise to reasonable suspicion of criminal activity . . . .").[9]

Given that Sheridan's vehicle was parked and that Lucero had a drug dog that he used to find the drugs, there were notably few Fourth-Amendment restrictions on Lucero's conduct. The Court notes that the Supreme Court has recognized that a police dog sniffing a vehicle does not constitute a search under the Fourth Amendment, meaning that police officers do not need to justify having their dog sniff a vehicle as reasonable:

> Accordingly, the use of a well-trained narcotics-detection dog -- one that "does not expose noncontraband items that otherwise would remain hidden from public view," -- during a lawful traffic stop, generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement.

Illinois v. Caballes, 543 U.S. 405, 409 (2005). Given that Sheridan appeared to be stopped, it does not appear that Lucero engaged in any seizure merely by stopping nearby the vehicle -- which was

-----

[9]The Court notes that there are no time-stamps on the Transcript of Traffic Stop to aid the Court in determining precisely how much time passed during the events in United States v. Sheridan. The entire transcript is approximately sixteen-and-a-half pages of dialogue. Lucero begins questioning Sheridan about his travel plans on page two of the transcript. Lucero begins to press Sheridan about the plausibility of his travel plans on page six of the transcript. Lucero finishes questioning Sheridan about his travel plans on page nine of the transcript. The drug dog alerts to the presence of drugs in the vehicle on page fifteen of the transcript. There appear to be no gaps of time during the dialogue in the transcript until after the drug dog alerts to the presence of drugs in the vehicle. After considering the likely length of time that passed during this investigation and the sequence of events, the Court does not believe that the length of the investigation suggests that Lucero did not "diligently pursue[]" his investigation during the investigatory detention such that the investigatory detention transformed into an arrest before the drug dog alerted to the presence of drugs. See United States v. Soto-Cervantes, 138 F.3d 1319, (10th Cir. 1998)("The men were detained for approximately twenty minutes while the officers searched the area, patted them down, and asked for identification. This length of time was not unreasonable. There is no evidence that the police took more time than was necessary to investigate the suspected drug activity . . . ." (footnote omitted)(citation omitted)).

already parked.  The Tenth Circuit has recognized such a scenario:

> Ms. Villa contends the Supreme Court's holding in <u>Caballes</u> -- that a dog sniff by a reliable drug-detection dog does not implicate the Fourth Amendment -- is limited to dog sniffs executed during the course of a legal traffic stop. Accordingly, Ms. Villa argues that in this case the dog sniff of the rental vehicle parked in a public place required probable cause because the rental vehicle was no longer part of a legal traffic stop.  Ms. Villa invokes the dissenting opinions in <u>Caballes</u> to support her position.
>
> This court has rejected the limited reading of <u>Caballes</u> Ms. Villa proposes. Prior to <u>Caballes</u>, we held that a random dog sniff of a vehicle without prior lawful detention or reasonable suspicion is not a search subject to the Fourth Amendment. <u>United States v. Ludwig</u>, 10 F.3d 1523, 1527 (10th Cir.1994).  After <u>Caballes</u>, we confirmed our position on this issue and held that "[a] dog sniff of the exterior of a vehicle parked in a public place . . . is not a Fourth Amendment intrusion." <u>United States v. Engles</u>, 481 F.3d 1243, 1245 (10th Cir. 2007).  Therefore, Ms. Villa's limited reading of <u>Caballes</u> is foreclosed by circuit precedent.  In this circuit, a dog sniff by a reliable drug-detection dog of a vehicle parked in a public place does not implicate the Fourth Amendment and does not require probable cause.

<u>United States v. Villa</u>, 348 F.App'x 376, 378 (10th Cir. 2009).  Once the dog alerted to the presence of drugs, Lucero had probable cause to search the vehicle.  <u>See</u> <u>United States v. Ludwig</u>, 10 F.3d 1523, 1527 (10th Cir. 1993)("[A] dog alert usually is at least as reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband.").  Thus, Lucero's conduct was proper under the Fourth Amendment.

**B.  NONE OF THE EVIDENCE UPON WHICH HARMON RELIES FROM <u>UNITED STATES V. SHERIDAN</u> BEARS ON LUCERO'S CREDIBILITY IN A WAY THAT JUSTIFIES REOPENING THE SUPPRESSION HEARING OR RECONSIDERING THE DENIAL OF THE MOTION TO SUPPRESS.**

Harmon cites no legal authority for his conclusion that keeping the information out of the CAD that a whisper stop had occurred was improper or dishonest.  As one court has recognized, a CAD report is not an exhaustive record of what occurs during an investigation:

> Neither the audio record nor the CAD report constitutes a complete historical record of an event.  The audio record does not include information entered by officers in their [mobile data units].  The CAD report does not include every radio

-50-

> communication, but only those the dispatcher chooses to include in the report.
> Likewise, the CAD report may not include information an officer enters into his or
> her [mobile data unit] because the officer has discretion in determining whether to
> include the information in the CAD report.

United States v. Cannon, 2006 WL 3206267, at *1.  Thus, omissions in a CAD report are not

unusual.  Harmon has directed the Court to no standards that govern what must appear in a CAD

report to lead the Court to believe that Lucero acted improperly in telling the dispatcher not to

include information in the CAD that a whisper stop had taken place.  Furthermore, the Supreme

Court has recognized in various contexts that law enforcement can have legitimate reasons for

keeping certain information secret or confidential.  See John Doe Agency v. John Doe Corp., 493

U.S. 146, 156 (1989)("Congress recognized that law enforcement agencies had legitimate needs to

keep certain records confidential, lest the agencies be hindered in their investigations or placed at

a disadvantage when it came time to present their cases."); FBI v. Abramson, 456 U.S. 615, 628 n.12

(1982)("Information transmitted for a non-law-enforcement purpose may well still be used in an

ongoing investigation.  Moreover, by compromising the confidentiality of information gathered for

law enforcement purposes, the Court of Appeals' decision could result in restricting the flow of

essential information to the Government.").  As the United States Court of Appeals for the First

Circuit has stated:

> [T]he government is under no obligation to provide private citizens with
> information concerning ongoing criminal investigations.   Prior to an indictment,
> governmental authorities are under an obligation not to reveal the existence and
> nature of an investigation concerning individuals who are merely suspected of
> criminal activities. . . . The government is under no duty to announce its suspicions
> or internal investigations to the "world at large."

Gonzalez-Bernal v. United States, 907 F.2d 246, 250 (1st Cir. 1990)(citations omitted).  Without

some kind of authority to support his argument, Harmon's contention that Lucero keeping this

information out of the CAD was impermissible conduct is not persuasive in light of the general

-51-

recognition that law enforcement officers have a legitimate concern in keeping ongoing criminal investigations a secret.

Thus, the evidence from the United States v. Sheridan case, on the record before the Court, has no bearing on Lucero's credibility.  He does not appear to have engaged in any misconduct or acted in a dishonest manner.  Rule 608(a) states:

> A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character.  But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

Fed. R. Evid. 608(a).  "Under Federal Rule of Evidence 608(b), specific unrelated instances of a witness's prior misconduct may be used to impeach the witness at the discretion of the court, however, only to the extent the misconduct reflects on the witness's character for truthfulness." United States v. Beltran-Garcia, 338 F.App'x at 770 (emphasis added).  There appears to be no misconduct.  The United States' description of what occurred during the United States v. Sheridan investigation is more persuasive, and nothing on the transcript of the traffic stop indicated to the Court that Lucero had acted improperly.  While Lucero does not expressly state that he is keeping this information out of the CAD to maintain the secrecy of the DEA investigation, courts have recognized that one of the purposes of a whisper stop is "to avoid compromising the federal investigation."  United States v. Sanders, 668 F.3d at 1303.  Given that Lucero refers to a DEA investigation and tries to keep information regarding the DEA investigation out of the CAD, the transcript indicates that he was keeping that information out of the CAD to avoid compromising the federal investigation.  This case is not one where an officer is fabricating evidence or altering a police video in a manner favorable to a criminal investigation.

To the extent that the evidence bears on Lucero's credibility, the probative value of the

evidence in terms of affecting Lucero's credibility is too minimal to justify reopening the suppression hearing or reconsidering the Court's MOO denying the Motion to Suppress.  "The decision to reopen a suppression hearing is within the sound discretion of the trial court and is reviewed for abuse of discretion."  United States v. Wiseman, 172 F.3d at 1207-08.  "Generally, a court should be reluctant to reopen a case, and that principle has been applied to suppression hearings."  United States v. White, 455 F.App'x at 650.  Relevant factors for a court to consider are "the timeliness of the motion, the character of the testimony, the effect of granting the motion, and whether the opposing party will be prejudiced by reopening the hearing."  United States v. White, 455 F.App'x at 650.  The Fifth Circuit has stated: "While the district court has wide discretion in determining when to reopen an evidentiary hearing, it abuses its discretion where the new evidence creates a genuine factual dispute on an outcome determinative fact."  United States v. Mercadel, 2003 WL 21766541, at *6.  The Fifth Circuit has further elaborated that a district court properly denies a request to reopen the suppression hearing when a district court found "that the new evidence would not effect its determination."  United States v. Mercadel, 2003 WL 21766541, at *6.  Other courts, along with the Fifth Circuit, have recognized that a district court may properly evaluate, in deciding whether to reopen the suppression hearing, the impact the new evidence would have on its decision to revisit the suppression issue.  See United States v. Martin, 400 F.App'x at 537 (Eleventh Circuit); United States v. McCoy, 348 F.App'x at 901-02 (Fourth Circuit).  After having considered the evidence Harmon has presented and the potential value of reopening the suppression hearing, the Court does not believe the evidence warrants reopening the suppression hearing.

"Though Rule 608 does not explicitly specify how the trial court should exercise its discretion [in limiting impeachment evidence], the discretion must be exercised within the ambit of

the other rules of evidence, including Rules 401, 402, and 403, which address the relevance and probative value of possible evidence."  United States v. Beltran-Garcia, 338 F.App'x at 770.

> Although 608(b) of the Federal Rules of Evidence does state that specific instances of misconduct may be admissible to impeach a witness, that rule does not require or imply that every negative bit of evidence existing concerning a witness may be dragged into a case no matter how remote or minor the alleged misconduct.

United States v. Lafayette, 983 F.2d at 1106.  Any misconduct that occurred in the United States v. Sheridan investigation, which, on the record before the Court, was minimal at best, is too remotely connected to the current charges and not particularly probative as to Lucero's general character for truthfulness.   See   United States v. Oquendo, 192 F.App'x 77, 81 (2d Cir. 2006)(unpublished)("Though they may bear on the general credibility of the government witnesses, these alleged inconsistencies do not bear on the core findings of the suppression hearing . . . .").

The Court does not believe the applicable factors counsel in favor of reopening the suppression hearing.  Relevant factors for a court to consider in this context are "the timeliness of the motion, the character of the testimony, the effect of granting the motion, and whether the opposing party will be prejudiced by reopening the hearing."  United States v. White, 455 F.App'x at 650.  First, the Court does not believe the request seeking to reopen the hearing is untimely, because Harmon filed his Motion to Reconsider a little over two months after the Court denied his Motion to Suppress.  Second, the character of the testimony/evidence at issue, as the Court has already discussed, has little impeachment value, if any, against Lucero.  Third, the effect of granting the motion would be relatively disruptive to the procedural posture of this case, because Harmon has already entered a Plea Agreement and the Court would have to hold additional proceedings to resolve the Motion to Suppress.  Even if the Court granted the request to reopen the suppression hearing, the Court concludes that, given the minimal impeachment value, if any, of the evidence

from United States v. Sheridan, it would not change its decision to deny the Motion to Suppress. Fourth, the United States will face some prejudice in having to relitigate the suppression issues in the case, litigate whether to permit Harmon to withdraw his guilty plea in light of the Court's decision after reopening the suppression hearing, and then possibly try the case before a jury. Only one of those four factors, timeliness, weighs in favor of reopening the suppression hearing. Particularly given the unlikely scenario that the Court would change its decision on the Motion to Suppress, the applicable factors counsel against reopening the suppression hearing. For the same reasons, the Court reaffirms its decision to deny the Motion to Suppress.

## II.    **BRADY V. MARYLAND DID NOT REQUIRE DISCLOSURE OF THE EVIDENCE TO HARMON.**

Brady v. Maryland did not require disclosure of this evidence from the United States v. Sheridan investigation to Harmon. Given that the evidence has no bearing on Lucero's credibility, no disclosure was required under Brady v. Maryland, because the evidence is not material. Even if the evidence is impeachment evidence, Brady v. Maryland did not require the United States to disclose this evidence to Harmon before his suppression hearing or before he entered his guilty plea. Notably, both the Second and Fourth Circuit have held that, in the context of an alleged Brady v. Maryland violation, a district court properly denies a motion to reopen a suppression hearing when the defendant fails to establish that a violation of Brady v. Maryland. See United States v. Nosworthy, 2012 WL 1193715, at *4 ("Second, the district court correctly found that the government was not required to turn over the Esterine testimony under Brady."); United States v. McCoy, 348 F.App'x at 902 ("To show that the district court abused its discretion when it refused to reopen the suppression hearing, McCoy must establish that the Government violated Brady by withholding the tow-truck driver's testimony.").

A.      THE EVIDENCE FROM THE UNITED STATES V. SHERIDAN CASE IS
        NOT MATERIAL UNDER BRADY V. MARYLAND.

The holding in Brady v. Maryland requires disclosure only of evidence that is both favorable

to the accused, and "material either to guilt or to punishment."  373 U.S. at 87.  "Evidence is

material only if there is a reasonable probability that, had the evidence been disclosed to the defense,

the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. at 682.

A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."

United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted).  The Tenth Circuit has

noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional

materiality standard."  United States v. Fleming, 19 F.3d at 1331.  The Tenth Circuit has also found

that "[d]uplicative impeachment evidence is not material."  Douglas v. Workman, 560 F.3d at 1173.

"To be material under Brady, undisclosed information or evidence acquired through that information

must be admissible."  Banks v. Reynolds, 54 F.3d at 1521 n.34.

The Supreme Court, in Cone v. Bell, recently noted:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by
> Brady, only mandates the disclosure of material evidence, the obligation to disclose
> evidence favorable to the defense may arise more broadly under a prosecutor's
> ethical or statutory obligations.  See Kyles, 514 U.S. at 437 ("[T]he rule in Bagley
> (and, hence, in Brady) requires less of the prosecution than the ABA Standards for
> Criminal Justice Prosecution Function and Defense Function 3-3.11(a)
> (3d ed. 1993)").  See also ABA Model Rule of Professional Conduct 3.8(d)
> (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the
> defense of all evidence or information known to the prosecutor that tends to negate
> the guilt of the accused or mitigates the offense, and, in connection with sentencing,
> disclose to the defense and to the tribunal all unprivileged mitigating information
> known to the prosecutor, except when the prosecutor is relieved of this responsibility
> by a protective order of the tribunal").

556 U.S. at 470 n.15.  Favorable evidence is only material and thus subject to mandated disclosure

when it "could reasonably be taken to put the whole case in such a different light as to undermine

-56-

confidence in the verdict." <u>Cone v. Bell</u>, 556 U.S. at 470 (quoting <u>Kyles v. Whitley</u>, 514 U.S. at 435).

The Court does not believe that the evidence from the <u>United States v. Sheridan</u> case meets the standard under <u>Brady v. Maryland</u> to have mandated disclosure of that evidence.  As the Court has already discussed, based on the limited evidence before the Court in this case, Lucero engaged in no Fourth-Amendment violations in <u>United States v. Sheridan</u> and did not otherwise engage in any misconduct.  Thus, the evidence has no impeachment value against Lucero.  Furthermore, the <u>United States v. Sheridan</u> case was unrelated to the charges against Harmon.  On the record before it, the Court cannot soundly conclude that there was a "reasonable probability that, had the evidence been disclosed to the defense, the result of the [suppression hearing or guilty plea] would have been different." <u>United States v. Bagley</u>, 473 U.S. at 682.

### B.   NO DISCLOSURE WAS REQUIRED UNDER <u>BRADY V. MARYLAND</u> BEFORE HARMON'S SUPPRESSION HEARING OR HIS GUILTY PLEA.

The Supreme Court has held that the restrictions from <u>Brady v. Maryland</u> do not require "preguilty plea disclosure of impeachment information." <u>United States v. Ruiz</u>, 536 U.S. at 629 ("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not.").  The Supreme Court recognized that "impeachment information is special in relation to the <u>fairness of a trial</u>, not in respect to whether a plea is <u>voluntary</u>." <u>United States v. Ruiz</u>, 536 U.S. at 632 (emphasis in original).  It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." <u>United States v. Ruiz</u>, 536 U.S. at 632.  It stated: "It is particularly difficult to

-57-

characterize impeachment information as critical information of which the defendant must always

be aware prior to pleading guilty given the random way in which such information may, or may not,

help a particular defendant." United States v. Ruiz, 536 U.S. at 630.  It further related:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness
> of relevant circumstances, does not require complete knowledge of the relevant
> circumstances, but permits a court to accept a guilty plea, with its accompanying
> waiver of various constitutional rights, despite various forms of misapprehension
> under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court concluded that "a constitutional

obligation to provide impeachment information during plea bargaining, prior to entry of a guilty

plea, could seriously interfere with the Government's interest in securing those guilty pleas that are

factually justified, desired by defendants, and help to secure the efficient administration of justice."

United States v. Ruiz, 536 U.S. at 630.

The Tenth Circuit has elaborated these principles from United States v. Ruiz:

> Despite these representations of a knowing and voluntary plea in the plea
> agreement and at the plea colloquy, Mr. Johnson asserts that his plea was not
> knowing and voluntary because he did not know that he was giving up a claim that
> the government failed to disclose impeachment evidence.  The Supreme Court,
> however, foreclosed this exact argument in United States v. Ruiz, by holding that the
> government has no constitutional obligation to disclose impeachment information
> before a defendant enters into a plea agreement.   Ruiz emphasized that
> "impeachment information is special in relation to the fairness of a trial, not in
> respect to whether a plea is voluntary."  Rather, "a waiver [is] knowing, intelligent,
> and sufficiently aware if the defendant fully understands the nature of the right and
> how it would likely apply in general in the circumstances -- even though the
> defendant may not know the specific detailed consequences of invoking it."  Mr.
> Johnson understood that he was giving up his right to cross examine government
> witnesses.  He therefore generally knew what he was giving up, and his appeal
> waiver was not unknowing or involuntary.

United States v. Johnson, 369 F.App'x at 906.  The Tenth Circuit has stated in another case: "As the

Supreme Court stated in United States v. Ruiz, '[T]he Constitution does not require the Government

to disclose material impeachment evidence prior to entering a plea agreement with a criminal

defendant." United States v. Dighera, 217 F.App'x at 828 (alteration in original)(citation omitted).

The Tenth Circuit, in an unpublished opinion, held that the standard stated in United States v. Ruiz

did not apply to exculpatory evidence, but rather only to impeachment evidence:

> Ruiz is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence. Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in Ruiz that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a Brady violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

United States v. Ohiri, 133 F.App'x 555, 562 (10th Cir. 2005). The Tenth Circuit qualified its

holding in United States v. Ohiri, stating that the case presented "unusual circumstances." United

States v. Ohiri, 133 F.App'x at 562.

There is no sound basis for concluding that this evidence from United States v. Sheridan is

exculpatory evidence rather than impeachment evidence. The evidence comes from a separate

investigation with no connection to Harmon. The evidence does not bear on whether Harmon was

guilty or innocent of the charged conduct. It at best bears on Lucero's credibility. Both the Supreme

Court and the Tenth Circuit have recognized that the prosecution does not have the obligation to

disclose impeachment evidence before the entry of a guilty plea. To the extent that the United States

had an obligation to disclose this evidence, which the Court believes it did not based on the evidence

not being material, the timing of the guilty plea was not such that the United States engaged in

gamesmanship to avoid disclosing the impeachment evidence. As early as May 10, 2011, Harmon

indicated his intent to plead guilty. See Stipulated Motion for Continuance at 1, filed May 10, 2011

(Doc. 62)("[T]he Parties have reached a resolution in this Matter which requires a setting to accept a plea agreement.").  The parties were presumably in plea negotiations for at least some period of time before filing the Stipulated Motion for Continuance.  The trial was set for May 16, 2011, which was several days after May 10, 2011.  See Stipulated Motion for Continuance at 1 (asking the Court "to vacate the trial setting of 16 May, 2011).  Harmon did not wait until "the day jury selection was to begin" before entering the guilty plea.  United States v. Ohiri, 133 F.App'x at 562.  There was sufficient time between the filing of the Stipulated Motion for Continuance and the May 16, 2011, trial setting that the United States could have disclosed the evidence from United States v. Sheridan to make it viable impeachment evidence for Harmon.  Notably, "the belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'"  United States v. Burke, 571 F.3d at 1054.  Harmon cannot meet the standard that the evidence "created a reasonable doubt of guilt," given the lack of impeachment value, or at the very best minimal impeachment value, the evidence has.

As to the issue of disclosure before the suppression hearing, the Court acknowledges that the circuit courts have split on this issue.  Notably, the decisions that have found an obligation to disclose impeachment evidence before a suppression hearing predate the Supreme Court's 2002 decision in United States v. Ruiz.  United States v. Ruiz has significantly clarified the legal landscape in terms of the timing of disclosure of impeachment evidence.  The Supreme Court held that the restrictions from Brady v. Maryland do not require "preguilty plea disclosure of impeachment information."  United States v. Ruiz, 536 U.S. at 629 ("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not.").  Given the logical proceeding of events in a criminal case, the Court believes the

Supreme Court's holding in United States v. Ruiz would extend to suppression hearings. While parties sometimes negotiate a plea to avoid a ruling on a motion to suppress, in a typical case, a defendant pleads guilty after filing a motion to suppress and after securing a ruling. It would not be consistent with the holding in United States v. Ruiz to extend the obligation to disclose impeachment evidence to suppression hearings when the prosecution would have no obligation to make the disclosure at a later stage in many criminal proceedings -- before the defendant enters a guilty plea. As the United States District Court for the Central District of California recognized: "The continuing validity of these cases [that hold otherwise] may be questionable given the Supreme Court's decision in United States v. Ruiz." United States v. Welton, No. 09-00153, 2009 WL 2390848, at *8 (C.D. Cal. Aug. 1, 2009)(citation omitted).

Given that the Court has located no Tenth Circuit case deciding this issue, the Court believes that the Tenth Circuit would extend the holding of United States v. Ruiz to suppression hearings. The Supreme Court's rationale distinguishing the guilty-plea process from a trial applies equally to a comparison of the suppression-hearing process and a trial. The Court believes that both the Tenth Circuit and the Supreme Court would recognize that impeachment evidence need not be disclosed before a suppression hearing. In United States v. Ruiz, the Supreme Court recognized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." United States v. Ruiz, 536 U.S. at 632 (emphasis in original). It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632. Likewise, "the more information the defendant has, the more" likely he will be able to successfully suppress a particular piece of

-61-

evidence, but "the Constitution does not require the prosecutor to share all useful information with the defendant."  United States v. Ruiz, 536 U.S. at 632.  As the Supreme Court has recently recognized:

> The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Amendment says nothing about suppressing evidence obtained in violation of this command.  That rule -- the exclusionary rule -- is a "prudential" doctrine created by this Court to "compel respect for the constitutional guaranty."  Exclusion is "not a personal constitutional right," nor is it designed to "redress the injury" occasioned by an unconstitutional search.

Davis v. United States, 131 S.Ct. 2419, 2426 (2011).  Thus, there is no constitutional right to the suppression of evidence.  Furthermore, in comparison to exculpatory evidence, "[i]t is particularly difficult to characterize impeachment information as critical information of which the defendant must always be aware before pleading guilty given the random way in which such information may, or may not, help a particular defendant."  United States v. Ruiz, 536 U.S. at 630.  Much like the guilty-plea process, "the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances" before a suppression hearing.  United States v. Ruiz, 536 U.S. at 630.  Notably, other constitutional rights do not apply at suppression hearings, such as Confrontation Clause rights.  See United States v. Reyes-Vencomo, No. 11-2563, 2012 WL 843611, at *1 (D.N.M. Feb. 13, 2012)(Browning, J.)("Thus, the Court may consider hearsay in ruling on a motion to suppress."); United States v. Hernandez, 778 F.Supp.2d 1211,1226 (D.N.M.2011)(Browning, J.)(concluding "that Crawford v. Washington[, 541 U.S. 36 (2004),] does not apply to detention hearings").  Thus, assuming the evidence had impeachment value, there was no obligation for the United States to disclose this evidence from United States v. Sheridan before the suppression hearing.  Additionally, given the limited impeachment value of the evidence, assuming it has any impeachment value, no other

general considerations of due process or fundamental fairness would necessitate disclosure of the evidence before a suppression hearing.

### III.   RULE 16 DID NOT REQUIRE DISCLOSURE OF THE EVIDENCE TO HARMON.

Rule 16 did not require disclosure of this evidence from United States v. Sheridan.  Rule 16 provides:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> (i)    the item is material to preparing the defense;
>
> (ii)   the government intends to use the item in its case-in-chief at trial; or
>
> (iii)  the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).  Criminal defendants may not, however, embark on a "broad or blind fishing expedition among documents possessed by the Government."  Jencks v. United States, 353 U.S. at 667.  Rule 16(a)(2) provides, in part, that rule 16 "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2).  The Supreme Court has interpreted the term "defense" in this statute as referring to "an argument in response to the prosecution's chase in chief."  United States v. Armstrong, 517 U.S. at 462 ("We reject this argument, because we conclude that in the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief.").

To the extent rule 16 would apply to this evidence, the discovery order in this case would have required disclosure of the evidence by approximately June 24, 2010.  See Order at 1-2, filed

June 16, 2010 (Doc. 14)("Unless the defendant has filed the aforesaid waiver, within eight (8) days of the entry of this Order, the Government shall provide to defendant's counsel without motion all of the information to which defendant is entitled pursuant to Rule 16 . . . ."). Nevertheless, rule 16 does not apply to this evidence from United States v. Sheridan, because it is not material. It has no exculpatory value regarding Harmon's guilt or innocence. Additionally, it has no impeachment value to attack Lucero's credibility. Even assuming that the United States violated rule 16 by not disclosing this evidence, the Court does not believe that Harmon's requested remedy of reopening the suppression hearing is appropriate given the limited impeachment value, if any, this evidence has.

## IV.   THE COURT WILL NOT REOPEN THE SUPPRESSION HEARING OR CHANGE ITS DECISION TO DENY THE MOTION TO SUPPRESS.

The Court has considered the evidence from United States v. Sheridan and weighed its value as impeachment evidence. The Court does not believe the evidence has impeachment value. Thus, the Court will not reopen the suppression hearing. Consequently, it is unnecessary for the Court to reconsider its MOO denying the Motion to Suppress. Additionally, the United States has not engaged in any conduct that would require the Court to impose a sanction of excluding any evidence of Harmon's guilt.

## V.   THE COURT WILL NOT PERMIT HARMON TO WITHDRAW FROM HIS GUILTY PLEA.

The Court does not believe that the applicable factors counsel in favor of permitting Harmon to withdraw his guilty plea. Rule 11(d)(2)(B) provides that a defendant may withdraw a plea if "the defendant can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). Defendants do not have an absolute right to withdraw a guilty plea. See United States v. Siedlik, 231 F.3d at 748. District courts, however, have broad discretion in determining whether

to grant motions to withdraw pleas.  See United States v. Wright, 392 F.App'x at 627.  The Tenth Circuit has repeatedly held that, when a defendant moves to withdraw a guilty plea before sentencing, a court must assess whether there is a fair and just reason for withdrawal based on the following factors:

> (1) whether the defendant has asserted his innocence; (2) whether withdrawal would prejudice the government; (3) whether the defendant delayed in filing his motion, and, if so, the reason for the delay; (4) whether withdrawal would substantially inconvenience the court; (5) whether close assistance of counsel was available to the defendant; (6) whether the plea was knowing and voluntary; and (7) whether the withdrawal would waste judicial resources.

United States v. Yazzie, 407 F.3d at 1142.  While treated sometimes as an eighth factor, a district court may properly consider "the likelihood of conviction" when assessing whether to permit withdrawal of a guilty plea.  See United States v. Carr, 80 F.3d at 421 n.5.

If the Court had decided to revisit its decision to deny the Motion to Suppress, the Court might have some basis for permitting Harmon to withdraw from his guilty plea.  Now that the Court has decided that the circumstances do not counsel in favor of the Court reopening the suppression hearing or revisiting its denial of the Motion to Suppress, Harmon is effectively in the same position where he was when he entered his guilty plea.  Harmon has not contested his guilt for the underlying offense, but rather has directed his arguments at the issue of suppressing the evidence against him.  In his Plea Agreement, Harmon has agreed to a sentence at the statutory minimum for his offense -- five years.  See 21 U.S.C. § 841(b)(1)(B) (imposing "a term of imprisonment which may not be less than 5 years and not more than 40 years" for possession with intent to distribute "500 grams or more of a mixture or substance containing a detectable amount of" cocaine).  Given that Harmon has presented no new evidence that would aid him in asserting that he is not guilty of the charges against him, the Court believes that Harmon realistically has achieved, under the Plea Agreement, one of

the best results for which he could hope.

The first factor regarding whether the defendant has asserted his innocence weighs against withdrawal. To satisfy the first factor based on an assertion of legal innocence, the Tenth Circuit has held that a defendant must present a "credible claim of legal innocence," United States v. Hamilton, 510 F.3d 1209, 1214 (10th Cir. 2007), and that a "defendant's subjective belief in his own innocence does not mandate allowing him to withdraw his plea of guilty," United States v. Hickok, 907 F.2d 983, 985 n.2 (10th Cir. 1990).[10] This factor means that a defendant must "make a factual argument that supports a legally cognizable defense." United States v. Hamilton, 510 F.3d at 1214. Harmon has not argued that he is innocent of the charge in Count I of possession with intent to distribute 500 grams and more of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). Moreover, the evidence against him appears strong. Thus, this factor weighs against permitting him to withdraw from his guilty plea.

The second factor regarding prejudice to the government weighs somewhat against withdrawal of the guilty plea. The United States has represented that trying the case would require it to "suffer the prejudice inherent in prosecuting any case that is over a year and a half old." Response to Supplemental Motion at 3. The Tenth Circuit has recognized that requiring the United States to try a case it would not otherwise have to try, particularly when preparation for the trial will be difficult, results in prejudice to the United States. See United States v. Jones, 168 F.3d 1217, 1220 (10th Cir. 1999)(finding that allowing the defendant to withdraw his plea "could also prejudice

---

[10]Establishing a credible claim of innocence is one of the seven factors that the Court considers under United States v. Yazzie and is not a prerequisite to permitting withdrawal of the plea. See United States v. Cervantes, 115 F.App'x 1, 9 (10th Cir. 2004)(unpublished)(relying on a decision from the D.C. Circuit, which states "whether the movant has asserted his legal innocence is an important factor to be weighed"(citing United States v. Barker, 514 F.2d 208, 221-22 (D.C. Cir. 1975)).

the government," because the "government will face the presumably difficult task of locating confidential informants"). While this factor does not weigh heavily in any one direction, it weighs somewhat in favor of not permitting Harmon to withdraw his guilty plea.

The third factor -- whether the defendant delayed in seeking withdrawal of the guilty plea -- weighs in favor of withdrawal. Harmon filed his Motion to Withdraw Plea approximately four months after he entered the guilty plea and approximately two months after he filed his Motion to Reconsider asserting that he had learned of the evidence from United States v. Sheridan. While some delay has occurred, the Court does not believe that the delay is so significant that this factor weighs against Harmon. See United States v. Kramer, 168 F.3d 1196, 1202 (10th Cir. 1999)(recognizing that an eight-month delay and a motion to withdraw a guilty plea filed on "the eve of sentencing" constituted delay). Thus, this factor weighs in favor of withdrawal.

Looking at the fourth and seventh factors, whether withdrawal would substantially inconvenience the Court or waste judicial resources, the Court notes that there will almost always be some inconvenience or resource allocation when a case that has settled goes to trial. In previous cases, the Court has recognized that the gravity of the defendant's circumstances in a given case influences whether "the withdrawal of his plea, with all that it implies, would substantially inconvenience the Court of waste judicial resources." United States v. Gould, No. 03-2274, 2006 WL 4061159, at *3 (D.N.M. Sept. 23, 2006)(Browning, J.). Harmon pled guilty to a significant charge, which carries a minimum sentence of five years and a maximum sentence of forty years. The underlying facts in this case do not appear particularly complex or suggest that the trial would require a substantial amount of time. See United States v. Carr, 80 F.3d 413, 421 (10th Cir. 1996).[11]

---

[11]The Tenth Circuit recognized in United States v. Carr that, while "[t]he anticipated length and complexity of the government's case . . . should not necessarily weigh against [a defendant]

Nevertheless, the prospects of Harmon securing an acquittal appear low given that he has largely not contested his guilt and has presented no basis to the Court that would lead it to the conclusion that he will receive a more favorable sentence than the one to which he agreed in the Plea Agreement.  Thus, the Court concludes there is more inconvenience to the Court and a larger waste of judicial resources than in a typical case, particularly given the busy criminal docket in this district.  While treated sometimes as an eighth factor, a district court may properly consider "the likelihood of conviction" when assessing whether to permit withdrawal of a guilty plea.  See United States v. Carr, 80 F.3d at 421 n.5 (recognizing that the Tenth Circuit has "suggested an additional factor to consider: the likelihood of conviction" (citing United States v. Glover, 911 F.2d 419, 421 (10th Cir. 1990)).  The Court believes that consideration of likelihood of conviction is relevant here, either in the context of the two factors of whether withdrawal would substantially inconvenience the Court or waste judicial resources, or as an additional factor.  The Court does not believe, however, that the inconvenience to the Court and waste of judicial resources would be severe.  Thus, these factors are neutral in this case or could weigh slightly against withdrawal.

The Court finds that Harmon had close assistance of counsel before and during his plea hearing.  Harmon asserts in a conclusory manner in his Motion to Withdraw Plea that he received ineffective assistance of counsel.  He asserts that "exculpatory evidence has been discovered," presumably referring to the alleged impeachment evidence from United States v. Sheridan.  As the Court has already concluded, this evidence is not exculpatory and has no impeachment value.  While Harmon appears to have been unhappy with several of the attorneys who represented him, given that

since he originally had a right to a jury trial," the "disruption of [the court's] docket and consequent delays in pending cases" justified this factor weighing against the defendant in that case.  United States v. Carr, 80 F.3d at 420-21.

he is now on his fourth attorney, the Court cannot say that his attorneys have performed deficiently. Given that Harmon's guilt is largely uncontested, and that the Court finds no basis for suppressing the evidence against Harmon, the Court concludes that his counsel appropriately negotiated a plea agreement with a stipulated sentence of five years -- the statutory minimum for Count I. Realistically, Harmon has little chance of securing a better result at trial given that he does not assert that he is innocent.  The Court sees nothing deficient about his attorneys' performance in this respect.  Harmon may not like the seriousness of the charges against him and the substantial sentences they carry, but that does not mean that his attorneys acted in a deficient manner. Likewise, the plea colloquy in front of Judge Garcia indicates that Harmon approved of his attorneys' performance at the time he entered into the plea.  "The plea of guilty is a solemn act not to be disregarded because of belated misgivings about [its] wisdom."  United States v. Morrison, 967 F.2d at 268.  Thus, this factor weighs against permitting withdrawal of the guilty plea.

The Court gives substantial weight to the sixth factor -- whether the plea was knowing and voluntary.  The Tenth Circuit has recognized that a defendant's guilty plea must be knowing, voluntary, and intelligent.  See United States v. Libretti, 38 F.3d 523, 529 (10th Cir. 1994).  To enter a plea that is knowing and voluntary, a defendant must have "a full understanding of what the plea connotes and of its consequence."  Boykin v. Alabama, 395 U.S. 238, 244 (1969).  A defendant must understand only the plea's "direct consequences."  United States v. Hurlich, 293 F.3d 1223, 1230 (10th Cir. 2002).  Harmon has not argued that his guilty plea was unknowing or involuntary at the time he entered the plea, because he did not understand some aspect of his rights or the charges against him.  Rather, he argues that his guilty plea was not knowing and voluntary, because he was not aware of the evidence from United States v. Sheridan.  The Tenth Circuit has found that Harmon's argument is not a proper basis for arguing that a plea was unknowing or involuntary:

Despite these representations of a knowing and voluntary plea in the plea agreement and at the plea colloquy, Mr. Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence.  The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement.  Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary."  Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances -- even though the defendant may not know the specific detailed consequences of invoking it."  Mr. Johnson understood that he was giving up his right to cross examine government witnesses.  He therefore generally knew what he was giving up, and his appeal waiver was not unknowing or involuntary.

United States v. Johnson, 369 F.App'x at 906.  The Tenth Circuit has also held that a defendant's guilty plea was not knowing was not "rendered involuntary by the fact that impeaching evidence was not available at the suppression hearing, through prosecutorial nondisclosure or ineffective assistance" when a habeas petitioner "did not establish that disclosure or discovery of the evidence . . . would have created a reasonable probability that the outcome of his suppression hearing would have been different."  United States v. Johnson, 117 F.3d 1429, 1997 WL 381926, at *5 (10th Cir. 1997)(unpublished table decision).  The Court has reviewed the plea colloquy in front of Judge Garcia and sees nothing in the colloquy that calls into question the knowing and voluntary nature of Harmon's guilty plea.  Thus, this factor weighs against withdrawal.

Only one of the factors weighs in favor of withdrawal.  Two of the factors are neutral, or weigh slightly against withdrawal.  Four of the factors weigh against withdrawal.  No other pertinent factors weigh in favor of withdrawal.  Most importantly, the key factors in this analysis, whether the defendant has asserted his innocence, whether the defendant had close assistance of counsel, and whether the defendant entered his plea in a knowing and voluntary manner, weigh against withdrawal.  The Court does not believe that Harmon has met his burden to show a "fair and just

reason for requesting the withdrawal."  Fed. R. Crim. P. 11(d)(2)(B).  Consequently, the Court will not permit him to withdraw his guilty plea.

In sum, the evidence from United States v. Sheridan does not serve as a basis for permitting Harmon to withdraw his guilty plea given that the Court will not reopen the suppression hearing or revisit its decision to deny the Motion to Suppress.  Harmon had everything he needed to make an informed decision at his plea hearing, and his counsel and Judge Garcia appear to have been careful to make certain he understood everything about the plea.  At the plea colloquy and in the Plea Agreement, Harmon said he understood the consequences of pleading guilty.  He appears to have pled guilty with full knowledge of the consequences.  No intervening events would make it unfair to hold Harmon to the terms of the Plea Agreement.  None of the evidence from United States v. Sheridan would appear to help Harmon secure an acquittal.  While it is true that a district court should freely permit withdrawal of a plea, see United States v. Garcia, 577 F.3d at 1274 ("Although a motion to withdraw a plea prior to sentencing should be freely allowed, we will not reverse unless the defendant can show that the court acted unjustly or unfairly."), a defendant is not as a matter of course entitled to withdraw a guilty plea even when he asserts a plausible defense, see United States v. Garcia, 577 F.3d at 1275 ("However, the presentation of a plausible defense does not, ipso facto, mean that the district court abuses its discretion by denying leave to withdraw a guilty plea.").  Harmon has not asserted a plausible basis for his defense given that the Court still concludes that denying the Motion to Suppress is proper.  He is in the same position he was in before he filed the pending motions.  The Court is concerned that, if it were to allow Harmon to withdraw his guilty plea, it would be ill-advised to do so.  His trial would likely be like watching a train wreck, with no measurable benefit to Harmon.  His attorney negotiated the lowest possible sentence he could receive for Count I -- five years.  The Court believes it is within its discretion in precluding Harmon

from withdrawing his guilty plea.  Even if some factors weigh in favor of withdrawal, factors that "speak to the potential burden on the government and the court, rather than the defendant's <u>reason</u> for withdrawal . . . [,] cannot establish a fair and just reason for withdrawal."  <u>United States v. Wright</u>, 392 F.App'x at 629 (emphasis in original)(quoting <u>United States v. Hamilton</u>, 510 F.3d 1209, 1217 (10th Cir. 2007)).  <u>Accord</u> <u>United States v. Hamilton</u>, 510 F.3d at 1217 ("Similarly, a court need not address the timing of the defendant's motion, the inconvenience to the court, or the waste of judicial resources unless the defendant establishes a fair and just reason for withdrawing his guilty plea.").

At an earlier point in the Court's tenure, it took a more permissive approach to permitting the defendant to withdraw his guilty plea, particularly when presented with a plausible basis for innocence.  <u>See</u> <u>United States v. Gould</u>, 2006 WL 4061159, at *3-4.  "Over time, the Court has become more hesitant to permit plea withdrawals, as it has learned that this path often produces in unfavorable results for defendants."  <u>United States v. Begaye</u>, No. 10-0456, 2012 WL 119602, at *12 n.8 (D.N.M. Jan. 3, 2012)(Browning, J.).  In <u>United States v. Jim</u>, for example, the Court voiced these reservations and applied a more cautious approach to allowing plea withdrawal, but ultimately allowed withdrawal of the plea based on serious defects in the plea colloquy:

> The Court has serious reservations about allowing Jim to withdraw his plea of guilty and to withdraw from his Plea Agreement.  The Court has not seen similar scenarios work out well for defendants; indeed, similar scenarios often end up as disastrous for defendants.  Particularly here, where Jim has made admissions at the plea colloquy that may be used against him at his trial, Jim faces poor prospects at trial, and thus may face a guidelines range of 324 to 405 months, rather than the rule 11(c)(1)(C) plea agreement's 151 to 181 months.  Nevertheless, because the plea colloquy was deficient in explaining fully to him that he was waiving his right to trial, the Court believes that it should allow him to withdraw his plea and exercise his right to trial if he so desires.

2011 WL 6013093, at *13.  The Court believes that, in light of Harmon's largely uncontested guilt

for the underlying offense, denying his request to withdraw his guilty plea is the more reasonable approach for the Court to take.  Harmon faces a charge in Count I that has a minimum sentence of five years and a maximum sentence of forty years.  <u>See</u> 21 U.S.C. § 841(b)(1)(B) (imposing "a term of imprisonment which may not be less than 5 years and not more than 40 years" for possession with intent to distribute "500 grams or more of a mixture or substance containing a detectable amount of" cocaine).  The Plea Agreement is favorable to Harmon, and the Court believes that he does not have a reasonable expectation of better prospects at trial.  Thus, the Court will not permit Harmon to withdraw from his guilty plea.

**IT IS ORDERED** that: (i) the Defendant's Motion to Reconsider or Rehear, filed July 15, 2011 (Doc. 72), is denied; (ii) the Defendant's Motion by Way of the Defendant for Withdrawal of Plea Agreement filed on May 20, 2011, filed September 21, 2011 (Doc. 87), is denied; and (iii) the Defendant's Supplemental Motion to Withdraw Plea and to Re-Open Suppression Proceeding, filed December 22, 2011 (Doc. 102), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
   United States Attorney
James R.W. Braun
Sean J. Sullivan
   Assistant United States Attorneys
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

   *Attorneys for the Defendant*

-73-